ELM Medical Laboratory, Inc., & others [1] *vs.*
RKO General, Inc., & another. [2]

Suffolk.    December 5, 1988. — January 11, 1989.

Present: Hennessey, C.J., Abrams, Nolan, Lynch, & O'Connor, JJ.

*Libel and Slander. Malice. Practice, Civil*, Summary judgment, Complaint,
Amendment. *Privacy. Unlawful Interference. Words,* "Fair and accu-
rate," "Public figure."

This court extended a news reporter's qualified privilege of "fair report" to
the publication of public health warnings issued by a governmental
agency so long as the warnings, whether issued in a news release or in
interviews with government officials, are fair and accurate. [782-783]
A news reporter's qualified privilege of "fair report" of a "health alert" issued
jointly by the Boston office of the United States Department of Health
and Human Services and the Massachusetts Department of Public Health
indicating that "any woman who has had a pap smear taken by any of
[certain named physicians and clinics] should contact them promptly to
determine if rescreening is necessary" extended to four of five broadcasts
of a Boston television station as fair and accurate summaries of the
governmental report; however, a fifth broadcast stating that "more than
200,000 pap smears may have been misinterpreted" was not a fair or
accurate summary of the governmental report. [783-784]
In a defamation action, summary judgment was properly entered for a tele-
vision broadcasting company and its news reporter against the medical
director and general manager of a medical laboratory which had been
the subject of several broadcasts concerning the reliability of certain of
its laboratory test results, where the two individuals failed to demonstrate
a genuine issue of of material fact as to how they were personally
defamed. [784-785]
In a defamation action, summary judgment was properly entered for a tele-
vision broadcasting company and its news reporter against the operator
of a medical laboratory which had been the subject of several broadcasts
concerning the reliability of certain of its laboratory test results where
the laboratory, having been drawn into a public controversy, was a
public figure required to come forward with clear and convincing evi-

[1] Attilio Baez-Giangreco and Joan Attianese.
[2] Charlene Mitchell.

dence of actual malice; and where the laboratory failed to demonstrate a genuine issue of material fact that the television broadcasting company or its reporter acted with reckless disregard for the truth in broadcasting one inaccurate statement in a series of accurate broadcasts concerning the laboratory. [785-787]

A judge properly applied a news reporter's qualified privilege of "fair report" of a public health warning issued by two governmental agencies, and correctly ordered summary judgment against the operator of a medical laboratory and two of its employees on their claims for invasion of privacy and tortious interference with business relations, where the defendants, a television broadcasting company and its news reporter, had met their burden of showing that there was no genuine issue of material fact. [787]

The judge at the trial of a civil action did not err, in the circumstances, in refusing to allow the plaintiffs to amend their complaint a third time. [787]

CIVIL ACTION commenced in the Superior Court Department on May 17, 1982.

The case was heard by *John L. Murphy, Jr.*, J., on a motion for summary judgment.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*W. Paul Needham* for the plaintiffs.

*Laurie S. Gill* (*David R. Friedman* with her) for the defendants.

NOLAN, J. The plaintiffs, an incorporated medical laboratory (ELM), its medical director, and its general manager, claim that the defendant, RKO General, Inc. (RKO),[3] defamed them in five television broadcasts in July of 1980. The plaintiffs also claim invasion of privacy and tortious interference with business relations as a result of the broadcasts. A judge of the Superior Court allowed a motion for summary judgment in favor of RKO on all three counts. The plaintiffs appealed to the Appeals Court. We transferred the case to this court on our own motion. We affirm the judgment.

---

[3] We shall refer to both defendants as the defendant under the name "RKO."

1. *The broadcasts*. The five allegedly defamatory broadcasts were prompted by a news release issued jointly by the Boston office of the United States Department of Health and Human Services and the Massachusetts Department of Public Health. The July 2, 1980, news release, entitled "Health Alert," was an effort by Federal and State officials to identify all physicians, clinics and patients who might have used the ELM laboratory during the previous four years, because a joint Federal-State investigation had revealed that ELM had improperly screened or misread a large number of laboratory tests. The health alert indicated that "any woman who has had a pap smear taken by any of these physicians or clinics should contact them promptly to determine if rescreening is necessary."

The health alert further stated that: (1) health officials knew that "some women could be at risk because their PAP slides were improperly screened or actually misread," (2) "at least several hundred women are not aware that they are at some unnecessary risk of having abnormal, precancerous or cancerous conditions," (3) "[a]n estimated 150,000 to 200,000 women had slides sent to ELM Medical Laboratory" between June, 1976, and July, 1980, and (4) up to July 2, 1980, there were "22 misread cases of abnormal PAP smears of the 1,219 slides rescreened by the [Federal] Center for Disease Control [(CDC), in Atlanta, Georgia]."

RKO news reporter Charlene Mitchell prepared and delivered several reports on the ELM Medical Laboratory, as a result of the health alert. Mitchell has stated that her reports were based not only on the health alert press release, but also on interviews with State and Federal officials.

In the July 2, 1980, news program, RKO reported that "thousands of slides were misdiagnosed by a major medical lab in Boston," and that "possibly as many as several hundred women are at risk for an abnormal[,] precancerous or cancerous condition, related to the cervix." The defendant also reported that "retesting of some of the slides shows a 66% error rate," and that "so far the discrepancies have all been in the false negative slide[s], called negative when they were truly positive."

The statement that a health alert was issued because "thousands of pap smears were misinterpreted" was repeated in the 6 P.M. broadcast on July 3, 1980, followed by the qualified statement that "thousands of the pap smears may have been misread." Later that night, on the 11 P.M. news, RKO broadcast the statement, "The ELM Laboratory in Boston has been accused of misdiagnosing hundreds and perhaps thousands of pap smears . . . ." In the introduction to a July 5, 1980, news program, the defendant broadcast the following: "It was announced this week that more than 200,000 pap smears may have been misinterpreted at a Boston laboratory." Its final report on the subject, on July 28, 1980, included the comment, "[a]ccording to the state as many as twenty four hundred pap smears diagnosed at the ELM Lab could be faulty."

2. *The fair report privilege.* Massachusetts recognizes the "fair report privilege," which allows those who fairly and accurately report certain types of official or governmental action to be immune from liability for claims arising out of such reports. See, e.g., *Jones* v. *Taibbi*, 400 Mass. 786, 794-795 (1987) (Published reports of judicial, legislative or other official proceedings are privileged); *Sibley* v. *Holyoke Transcript-Telegram Publishing Co.*, 391 Mass. 468, 470-471 (1984) (fair report of judicial proceedings). This court stated in *Sibley* that the purpose of the privilege is to "ensure that publications may perform the important function of informing the public of actions taken by the courts." *Id.* at 472. The privilege recognizes that (1) the public has a right to know of official government actions that affect the public interest, (2) the only practical way many citizens can learn of these actions is through a report by the news media, and (3) the only way news outlets would be willing to make such a report is if they are free from liability, provided that their report was fair and accurate. See *id.* at 470-471.

The fair report privilege applicable to governmental action has been described as "companion to the privilege to report judicial proceedings." *MiGi, Inc.* v. *Gannett Mass. Broadcasters, Inc.*, 25 Mass. App. Ct. 394, 396 (1988). The Restatement (Second) of Torts § 611 (1977), acknowledges a privilege

to publish a fair report of official action. The fair report privilege is generally seen as allowing the news media to serve as a check on the power of government by giving the public the opportunity to be informed citizens and voters. See generally S. Metcalf, Rights and Liabilities of Publishers, Broadcasters and Reporters § 1.78 (1987), and cases cited therein. In this sense, the media are agents of the public and serve as its eyes and ears in matters of public concern. We hold that the rationale underlying the fair report privilege is served by extending the privilege to public health warnings issued by a governmental agency. Whether the warnings are issued in a news release or in interviews with officials, the privilege should attach so long as the media reports are fair and accurate. See *MiGi, Inc.* v. *Gannett Mass. Broadcasters, Inc., supra.* In *MiGi*, the Appeals Court indicated that a report need give only "a rough-and-ready summary that was substantially correct" in order to qualify for the fair report privilege. *Id.* A statement is considered a fair report "if its 'gist' or 'sting' is true, that is, if it produces the same effect on the mind of the recipient which the precise truth would have produced." *Williams* v. *WCAU-TV*, 555 F. Supp. 198, 202 (E.D. Pa. 1983).

The question, then, is which, if any, of RKO's five broadcasts were fair and accurate reports of a public health warning. The statements on July 2 and 3 (at 6 P.M. and 11 P.M.) concerning the number of potentially-misread slides are protected by the privilege because they fairly represented the information supplied by the agencies. The health alert stated that, of 1,219 slides the CDC had rescreened, 22 had been misread. This represents 1.8 percent of 1,219 slides. Application of the 1.8 percent rate to the undisputed range of 150,000 to 200,000 slides ELM processed, yields a potential result of 2,700 to 3,600 misread slides. Most of the broadcasts containing the allegedly inaccurate statements were qualified by phrases such as "possibly," "as many as," and "may have."

The report that "[r]etesting of some of the slides shows a 66% error rate" is also a fair and accurate report of the agencies' health alert, when viewed in context. The broadcast indicated that this error rate reflected the number of "false negative"

results.[4] Prior to the broadcast, a pathologist from the Federal CDC had projected a false-negative rate of 83 per cent for the ELM slides to be retested. After the CDC had completed its investigation, the agency found the false-negative rate was actually 76.4 per cent, which it termed not significantly different from the original estimate. Thus, the report of a 66 per cent error rate was a fair one. The understatement favored the plaintiffs.

The defendant's attribution to State officials that "as many as twenty four hundred pap smears diagnosed at the ELM Lab could be faulty" is also privileged because it substantially reflects the content of the governmental report. Retesting by the Federal CDC, which was cited in the same July 28, 1980, broadcast as a source of the information, demonstrates that the statement "as many as twenty four hundred" is accurate. The "sting" of this report would not have been significantly different if it had been correctly attributed to Federal, rather than State officials.

The July 5, 1980, statement that "more than 200,000 pap smears may have been misinterpreted," is not, however, a fair or accurate summary of the governmental report. For more than 200,000 pap smears to have been misinterpreted, ELM would have had to display an error rate greater than 100 per cent. While it is true that possibly as many as 200,000 patients were at risk because each had no way of knowing if hers was one of the misread pap tests, the broadcast did not accurately state that exposure. The health agencies never charged that ELM had a 100 per cent error rate. We now examine whether the July 5 statement defamed the plaintiffs.

3. *Defamation.* To establish a claim for defamation, a plaintiff must show, among other things, that the alleged defamation was "of and concerning" the plaintiff. *New England Tractor-Trailer Training of Conn., Inc.* v. *Globe Newspaper Co.*, 395 Mass. 471, 474 (1985). While it is clear that the broadcasts were of and concerning the corporate plaintiff, ELM, there is

---

[4] A "false negative" error results when cytology slides showing indications of abnormalities warranting further testing or treatment are classified by a screener as "normal."

serious doubt, as the trial judge indicated, that the news reports were of and concerning the individual plaintiffs, Dr. Baez-Giangreco and Ms. Attianese. In Massachusetts, the test whether a report is of and concerning the plaintiff is met by proving either (1) that the defendant intended the words to refer to the plaintiff and that they were so understood or (2) that persons could reasonably interpret the defendant's words to refer to the plaintiff and that the defendant was negligent in publishing them in such a way that they could be so understood. *Id.* at 483. The reference must be to the individuals as separate persons. The officer of a corporation who is not personally defamed has no right to recover damages for defamation published about the corporation. *Finnish Temperance Soc'y* v. *Finnish Socialistic Publishing Co.*, 238 Mass. 345, 354 (1921).

The plaintiffs do not claim that RKO intended the broadcasts to refer to the individual plaintiffs; hence, they must show that RKO was negligent in broadcasting words that could reasonably be interpreted to refer to them. The only mention of any individual is a statement, made in three broadcasts, that one former employee appeared to be responsible for the majority of the faulty lab results and that the former employee was now working in another laboratory. Neither Baez-Giangreco nor Attianese was a former employee working in another laboratory.

The plaintiffs submitted two affidavits in which a former client and an ELM employee indicated that they understood the broadcasts to refer to Baez-Giangreco and Attianese. These affidavits do not explain how their conclusion was a reasonable one based on the broadcasted statements. We conclude that the two individual plaintiffs failed to demonstrate a genuine issue of material fact as to how they were personally defamed and thus the entry of summary judgment against them was appropriate on the defamation count on that basis alone.

To decide whether summary judgment was properly granted on the defamation count on behalf of ELM, we must decide whether the remaining plaintiff, ELM, was a private or public figure so that we can determine the degree of fault the plaintiff must prove. See *Stone* v. *Essex County Newspapers, Inc.*, 367 Mass. 849, 858 (1975). The determination of the plaintiff's

status is a question for the trial judge in the first instance. *Id.* at 862. Here, the judge correctly concluded that the plaintiff was a public figure in the context of these broadcasts.

An individual may achieve public figure status if he "voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues." *Gertz* v. *Robert Welch, Inc.*, 418 U.S. 323, 351 (1974). A public controversy is a dispute in which the outcome "affects the general public or some segment of it in an appreciable way." *Waldbaum* v. *Fairchild Publications, Inc.*, 627 F.2d 1287, 1296 (D.C. Cir.), cert. denied, 449 U.S. 898 (1980). Reports concerning dangers to the public health constitute public controversies. *Id.* Thus the plaintiff here achieved public figure status because it was drawn into a public controversy.

As a public figure for the purpose of the broadcasts, ELM was required to come forward with clear and convincing evidence of actual malice in response to RKO's motion for summary judgment. *New York Times Co.* v. *Sullivan*, 376 U.S. 254, 279-283 (1964). ELM was required to show facts by which a jury reasonably could conclude that RKO broadcasted false and defamatory statements concerning ELM with knowledge that the broadcasts were false or with reckless disregard of whether they were true or false. *Stone* v. *Essex County Newspapers, Inc.*, 367 Mass. 849, 867 (1975).

Although the existence of actual malice raises a state-of-mind issue, summary judgment is still an appropriate method for resolving claims when a plaintiff has failed to present evidence from which the motion judge could draw an inference of actual malice. *Godbout* v. *Cousens*, 396 Mass. 254, 258-259 (1985). As this court has noted, summary judgment may be desirable in defamation cases to protect First Amendment rights, as the "costs of litigation may induce an unnecessary and undesirable self-censorship." *King* v. *Globe Newspaper Co.*, 400 Mass. 705, 708 (1987).

The only broadcast that must be construed as potentially defamatory because it was not covered by the fair report privilege, is the July 5 broadcast in which the defendant stated,

"It was announced this week that more than 200,000 pap smears may have been misinterpreted at a Boston laboratory." As the plaintiff has not challenged the defendant's assertion that its sources for the story were the health alert and interviews with Federal and State officials, there is insufficient evidence that the defendant knew its mistaken statement to be false. Even though the challenged statement is not entirely accurate, it was one statement in a series of accurate broadcasts. The plaintiff has failed to demonstrate a genuine issue of material fact that RKO acted with reckless disregard for the truth in this instance.

4. *The remaining counts.* The plaintiffs claim that the trial judge erred in extending the fair report privilege to dispose of their remaining claims of invasion of privacy and tortious interference with business relations by summary judgment. The defendant has met its burden of showing that there was no genuine issue of material fact.

The only invasion of privacy the plaintiffs assert is "putting plaintiff[s] in a false light." This court has not recognized that tort and does not choose to do so now. *Fox Tree* v. *Harte-Hanks Communications, Inc.*, 398 Mass. 845, 848-849 (1986).

The specific elements which must be proved to establish intentional interference with advantageous business relations are: "(1) a business relationship or contemplated contract of economic benefit; (2) the defendant's knowledge of such relationship [or contract]; (3) the defendant's intentional and malicious interference with it; [and] (4) the plaintiff's loss of advantage directly resulting from the defendant's conduct." *Comey* v. *Hill*, 387 Mass. 11, 19 (1982). While there is some dispute as to whether ELM was still operating a business when the broadcasts aired, there is no evidence that RKO acted intentionally or maliciously in reporting on a serious public health threat.

Finally, we hold that the trial judge did not err in refusing to allow the plaintiffs to amend their complaint a third time. Since the motion judge considered transcripts of the actual broadcasts, the plaintiffs were not prejudiced by the denial. *Kenney* v. *Sears, Roebuck & Co.*, 355 Mass. 604, 609-610 (1969). The trial judge was well within his discretion. *Id.*

*Judgment affirmed.*