Fabricant, J.
INTRODUCTION
This action for libel was tried before the undersigned, jury-waived, on December 15-16, 1998. The evidence consisted of the testimony of the plaintiff and the defendant, along with eighteen documents admitted as exhibits. Based on all the evidence presented, the Court now makes the following findings, rulings, and order.
FINDINGS OF FACT
1. The plaintiff, Tony Martin, is a tenured professor in the Africana Studies Department at Wellesley College. He is a native of Trinidad. He studied law in London and became a Barrister there in 1965, before moving to the United States. He earned aPh.D. degree in history at Michigan State University in 1973. He joined the Wellesley College Faculty in 1973 as an Associate Professor, received tenure in 1975, and was promoted to full professor sometime thereafter. He has focused his scholarship on African American history, particularly Pan-Africanism and the work of Marcus Garvey. He has and continues to publish and to lecture frequently at universities and various organizations nationwide and internationally on topics related to his academic work. He considers himself an adherent of the “Afrocentric school,” which he describes as characterized by the view that “scholars of African origin should interpret their own experience.”
2. In accord with Wellesley’s policies, Martin was subject to consideration for tenure in 1975, two years after his initial employment as an associate professor. At that time one tenured position was available in his department, which was then known as the Black Studies Department. Professor William Scott had been at Wellesley in the same department longer than Martin, but in the ordinary course would not have been considered for tenure that year.[1] The College advanced Scott for consideration, with the result that Martin and Scott were in competition for the one position. It is Martin’s view that the College made that decision in an effort to “put roadblocks in [Martin’s] path” and to “destabilize the department.” The situation gave rise to student unrest, after which the College decided to make two tenured positions available in the department. Both Martin and Scott were considered for and granted tenure. Other than the change in timing for Scott, and the creation of an additional position in the Department, the College did not depart from its usual process in the tenure decisions. In particular, the grant of tenure to Martin did not result from, or occur in connection with, any litigation.[2]
3. In 1987, Martin filed suit against Wellesley College and its then president, Nannerl Keohane, in Norfolk Superior Court, No. 87-429. His amended complaint in that case, filed in 1987, alleged that in 1985 the College had given him a merit increase smaller than increases given to other faculty members due to his race, national origin, and exercise of his *523 right to freedom of speech. He further alleged in his amended complaint in that action that in 1975 Wellesley had, as part of a continuing “campaign to destabilize the Black Studies department,” “violated its own legislation in attempting to pass over plaintiff for consideration for tenure.” The amended complaint further alleged that “other components of the campaign of destabilization” included deficiencies in the recruiting and retention of black faculty and students, “the tolerance of an atmosphere of overt and covert racism on campus,” and subjecting black faculty to disadvantageous working conditions “so as to invite involuntary termination.” Martin and the College settled his 1987 suit in a manner that he considers “successful.” Under the settlement agreement, he is obligated to keep the terms of the settlement confidential.
4. In approximately the fall of 1992, Martin assigned to his students a work entitled The Secret Relationship Between Blacks and Jews, published by the Historical Research Department of the Nation of Islam. In a March 4, 1993 speech to Wellesley’s Academic Council, later published in a Wellesley student journal known as The Galenstone, Martin described the book as a “scholarly monograph,” which focuses on “the role that Jews played in the transatlantic slave trade.” According to Martin’s speech, the book “document[s] that Jews were heavily invested in the Dutch West India Company, which was a major multinational corporation involved in financing and prosecuting the slave trade,” and “shows that the Jews were a major element in the prosecution of the slave enterprise in Brazil, Curacao, Surinam, Barbados and Jamaica . . . ,” that they “were involved in shipping, auctioning and warehousing slaves” and that “[e]ven where they were not heavily involved in plantation agriculture, Jews nevertheless owned and traded slaves.” Martin’s speech went on to say that in the United States, the book “suggests that. . . Jews had a higher per capita slave ownership than for the white population as a whole ...” and that “abolitionism was distinguished by a relative scarcity of Jewish voices.” According to Martin’s speech, the book “shows that Jews, like others, resorted to the Bible to rationalize slavery . . . to provide intellectual and moral justification for enslaving Africans.”[3]
5. Martin’s use of The Secret Relationship in his course quickly became a subject of intense controversy. The controversy began with articles, columns and editorials in the student-published Wellesley News, which, according to Martin, “vilified” him for using the book in his course. In March of 1993, Martin issued his response in the form of a publication he titled Broadside No. 1: Blacks & Jews at Wellesley News. That publication, according to Martin, was “spread around the country and overseas and . . . reprinted in its entirely by some African American publications.”[4]
6. The controversy soon spread far beyond the Wellesley campus into the national news media.[5] On April 5, 1993, according to their joint press release as quoted by Martin in his December 1993 book The Jewish Onslaught: Despatches from the Wellesley Battlejront, “Four leading Boston-based national and local Jewish organizations, the Anti-Defamation League (ADL), American Jewish Committee (AJC), American Jewish Congress (AJC), and the Jewish Community Relations Council (JCRC) charged today that Professor Anthony Martin, a member of the African American [sic] Studies Department at Wellesley College in Wellesley, Massachusetts has demonstrated clear-cut anti-Semitic prejudice in his classroom and on the Wellesley campus." As further described by Martin, “[t]he press release called upon Wellesley College to fire” him. The press release, according to Martin’s own account, stimulated further media coverage, and Martin became a topic of widespread discussion in the news media. Within days of the release, The Boston Globe, The New York Times, National Public Radio, and the Associated Press all ran pieces on Martin. According to Martin, friends as far away as Hong Kong and St. Lucia reported to him media coverage in those locations. Continuing into at least the spring of 1994, articles, columns, interviews, and editorials appeared regularly in nationally and internationally disseminated media outlets commenting on, and reporting comments on, Martin, his use of the book, his scholarship, and the validity of Afrocentrism as a scholarly approach. The substance of the news media commentary in general, as described by Martin in his book and as appearing in newspaper pieces admitted in evidence, was that The Secret Relationship was anti-Semitic, that Martin was anti-Semitic, that he was teaching anti-Semitic propaganda as history, that the content of his courses lacked scholarly validity, and that Wellesley should revoke his tenure and fire him.
7. In May of 1993, a Wellesley College student journal known as The Galenstone published a piece regarding an October 1991 incident involving Martin and a student by the name of Michelle Plantee. The piece consisted of lengthy interviews conducted in March 1992 with Martin and Plantee, in which the two gave conflicting accounts of the incident. The article itself did not explain the long time lag between the interviews and their publication, but alluded to efforts by the College administration to “keep this from the public.” According to Plantec’s version, as presented in the interview, while serving as a dormitory resident advisor, she observed Martin walking unescorted in the dormitory, in apparent violation of a rule requiring male guests to be escorted. When she inquired whom he was with, Martin responded by calling her a profane name, accusing her of racism and bigotry, and positioning himself in a manner that she found physically intimidating. After police arrived and established Martin’s identity, he returned to a room where a group *524 was gathered and repeated his accusation of bigotry against her. The incident, along with the College’s unresponsiveness to her in its aftermath, as well as statements made by Martin to other students about it afterward, caused her such emotional distress that she withdrew from the College. According to Martin’s version, as presented in the interview, while attending a highly visible event in a public area of the dormitory, he obtained permission from a dormitoiy staff person to use the restroom. As he came out of the restroom, Plantee and a group of other women accosted him rudely, despite circumstances that in his view made the legitimacy of his presence obvious. Martin denied the use of profanity, but admitted calling Plantee racist and a bigot, saying that “I’m not about to compromise when I think my dignity is assaulted.” In the aftermath of the incident, according to Martin, he refused a demand by the College administration that he apologize to Plantee, telling Galenstone that “I’ve never apologized to a racist, and I have no intentions at this point in my life of apologizing to someone who perpetrated a racist assault on me.”
8. At the time the Galenstone piece appeared, Avik Roy, the defendant in this action, was completing his undergraduate studies at MIT. While a student there, Roy and others, including students from both MIT and Wellesley, founded an organization called The Advocates for Rational Discourse, which initiated publication of a journal entitled Counterpoint. The purpose of both the organization and the journal, according to Roy, was “in response to partisanship in campus debate." Roy served as publisher of Counterpoint during the 1991-92 school year, and president during the 1992-93 school year. The journal was entirely student written and student run, with a board of advisors, including faculty, whose primary function, according to Roy, was to “boost its stature.” Counterpoint published about five issues in each year, with distribution on the two campuses.
9. Members of the Counterpoint staff had heard about the Martin/Plantec incident soon after it occurred, and had later heard that Galenstone had produced but not published an article about it. When the interviews appeared, Counterpoint staff discussed doing an article on Martin. The discussion included, in addition to Roy, other staff members, only four of whose names Roy could remember at the time of trial. Only two of those, Alyson Todd and Samira Khan, were students at Wellesley. The staff agreed that Roy would write the article, in part on the theory that a nonWellesley student would be more detached on the subject. As of that time Roy was aware of the controversy surrounding Martin’s teaching of The Secret Relationship, but had never met Martin or had any contact with him, had no personal animosity toward him, and had no opinion regarding Martin’s qualifications for his faculty position or the quality of his scholarship.
10. As Roy completed his studies and prepared for his graduation from MIT, he gathered materials and information for use in writing the article. The materials he gathered were the Galenstone article, articles from the Wellesley News, and Martin’s Broadside No. 1: Blacks & Jews at Wellesley News. Roy also obtained certain information from a Wellesley student who was a member of the Counterpoint staff, whom Roy knew and believed to be reliable, and who provided the information on the condition that Roy promise to keep her identity confidential, in response to concerns she expressed regarding possible retaliation against her.[6] The information obtained from the confidential source included that the Wellesley administration had sought to cover up the incident, forbidding witnesses to speak of it and threatening student journalists with withholding of recommendations if they printed information about the incident. The source provided names of others who would corroborate this information; Roy contacted those others, and they did. The confidential source also reported to Roy the information that is at the center of this case: that she had been told in confidence by mid- to senior-level members of the Wellesley faculty or administration that Martin had gained tenure only after successfully suing the College for racial discrimination. Upon receiving this information from the confidential source, Roy believed it to be true, because he considered the source credible, and because he considered the information plausible in light of Martin’s statements, as quoted in the Galenstone interview, that he would not compromise with what he perceived to be racism. Roy did not attempt to corroborate the information by checking with any sources within the Wellesley College administration, or contacting its general counsel’s office. Nor did he contact Martin for comment. Roy did attempt, unsuccessfully, to obtain details about the alleged lawsuit from Lexis/Nexis, to which he had access at MIT, but which he had never used before.[7]
11. Martin contends that Alyson Todd was the confidential source. The evidence presented at trial warrants, but does not compel, the inference that she was. Alyson Todd was at the time a Wellesley student, a member of the Counterpoint staff, and a friend of Roy. She and Roy had discussed the controversies surrounding Martin, particularly with respect to the content of his teaching. Roy was aware that Todd held views in disagreement with views attributed to Martin.[8] No evidence indicates thatTodd had any personal animosity toward Martin, any desire to cause him harm, or any other motive to fabricate information about him, nor does any evidence indicate that Roy had any reason to think that she did.
12. In August of 1993, after having graduated from MIT in the spring and having spent the summer doing research work at MIT, Roy went to his mother’s home in Michigan for a vacation before beginning studies at Yale Medical School. During that vacation he wrote the article that is the subject of this case. The article was *525 published in the September 1993 issue of Counterpoint. The thirteen-paragraph article, beginning on page six and continuing on page twenty, is headlined “Afrocentric Scholar Accused of Harassment: Wellesley’s Tony Martin, whose image was battered in controversy last year, must weather another storm.” The focus of the article was the Michelle Plantee incident, and Wellesley’s efforts to cover it up. The portion of it that is the subject of this case is the tenth paragraph, which appeared on page twenty, and reads in its entirety as follows:
Counterpoint has also learned that, according to sources within the administration, Prof. Martin gained tenure within the Africana Studies department only after successfully suing the college for racial discrimination, providing a possible explanation as to Martin’s outspoken racial views as well as the administration’s reluctance to openly censure him.
13. After publication of the article, until this suit was filed, neither Roy nor anyone at Counterpoint received any indication from Martin or anyone else that this statement was in any way inaccurate. After obtaining information through discovery in this case, Counterpoint published a “clarification” in its February 1995 issue, as follows:
Counterpoint has now learned that while Professor Martin did sue the college, that particular suit related to a dispute about a merit increase, and it was some years after he had received tenure. The Amended Complaint in that law suit, however, did allege that Wellesley had attempted to pass over the plaintiff for consideration for tenure, as part of an alleged “campaign” to “destabilize the Black Studies Department.” Counterpoint regrets the error.
14. Martin saw the Counterpoint article sometime in the fall of 1993. He did not contact Roy or Counterpoint to complain of any inaccuracy. After publication of the article, Martin received comments about it from his brother in England, a friend in Trinidad, and an unknown number of students, as well as e-mail communications about it from one or two people not known to him. From the time of the publication until the time of trial, the total number of people who mentioned the article to Martin is not more than twenty. Of these, the only people who specifically mentioned the particular statement in issue here were Martin’s brother and his friend in Trinidad, both of whom knew that he had received tenure without filing any lawsuit. Martin is unaware of any other article or news source having ever repeated the statement. Martin is unaware of anyone who believes, as a result of the article, that he received tenure only after suing the College for discrimination. He is also unaware of any student who has decided not to take his courses because of such a belief. He does recall on occasion being asked by a student whether the statement was true, and replying that it was not.
15. In approximately early December 1993 Martin published a book entitled The Jewish Onslaught: Despatches from the Wellesley Battlefront. He printed some ten thousand copies, and distributed them across the United States and abroad.[9] The synopsis on the back cover of the book, written by Martin, summarizes its contents as follows:
The Jewish attack on Black progress reached Wellesley College in 1993, when more Jewish organizations than you could shake a stick at issued a call for the dismissal of Dr. Tony Martin from his tenured professorship at the elite women’s college.
Martin, one of the school’s most senior, best known and most widely published scholars suddenly found himself the target of a hysterical campaign of Jewish lies, distortions and half-truths, spread around the country and internationally by the major media. His “crime”? He had included less than one day’s worth of readings on Jewish involvement in the African slave trade in his survey course on African American history.
With rare insight and biting wit, Martin replies to his detractors and offers a historian’s analysis of the escalating Jewish onslaught against Black people.
16. This publication intensified the controversy surrounding Martin, and the public pressure on Wellesley to take action against him. Wellesley’s recently installed president, Diana Chapman Walsh, responded by sending a letter, dated December 15, 1993, to each of the College’s many thousands of alumnae, faculty, students, and parents of students. The letter stated that “We are profoundly disturbed and saddened by Professor Martin’s new book because it gratuitously attacks individuals and groups at Wellesley College through innuendo and the application of racial and religious stereotype.” The letter went on to affirm “Martin’s right to express himself,” although the book “violates ... norms of civil discourse, standards of scholarly integrity, and aspirations for freedom and justice” and “crosses the line from simply unpopular or controversial argument to unnecessarily disrespectful and deeply divisive speech that must be countered, however strong the temptation not to dignify it with a response." Martin’s book, and the Walsh letter, joined his teaching of The Secret Relationship as topics of comment about Martin in columns, letters, and editorials published widely in the national news media.
17. In 1995, Martin applied for the position of Director of Africana Studies at the University of Toledo. Upon his arrival in Toledo for an interview, he was told by the chair of the selection committee that the University had received anonymous faxes about him, including copies of the Counterpoint article and others. In the course of the interview, he was asked about the article and the events described in it, but no mention was made of the particular statement in issue *526 here, regarding the manner in which he obtained tenure at Wellesley. According to a letter from the chair of the selection committee, dated January 26, 1996, addressed “To whom it may concern,” Martin’s application for that position was rejected because of “charges leveled against him that might be characterized as ‘academic licentiousness’ ” and “other tenuously substantiated charges of odiousness . . . that ultimately shocked the sensibilities of evaluators.” The letter makes no mention of the manner in which Martin gained tenure at Wellesley, or of the part of the Counterpoint article that is the subject of this case. No evidence supports Martin’s contention that the statement in issue in this case had any causal connection with his rejection for that position.
18. Martin suffered emotional distress in connection with the controversies about him. He offered no competent evidence of any physical manifestations of his distress. He did not seek or receive any professional treatment for his condition. Nothing in the evidence supports any causal link between Martin’s distress and the particular statement that is the subject of this case, as distinguished from the rest of the commentary about him.
CONCLUSIONS OF LAW AND DISCUSSION
To recover on a claim of libel, a plaintiff must prove five elements. First, he must prove by a preponderance of the evidence that the defendant published the particular statement in issue in the case. Second and third, he must prove by a preponderance of the evidence that the particular statement in issue is both false and defamatory. The Fourth element that a plaintiff who is a public figure must prove, this one by clear and convincing evidence, is that the defendant published the statement with actual malice. Fifth and finally, the plaintiff must prove by a preponderance of the evidence that the statement caused damage to his reputation. See generally, Dulgarian v. Stone, 420 Mass. 843, 847 (1995); McAvoy v. Shufrin, 401 Mass. 593, 597-98 (1988), and cases cited. Here, the first element, that of publication, is undisputed. As to all four of the other elements, Martin has failed to meet his burden of proof.
As the findings set forth supra show, the statement in issue — that Martin gained tenure at Wellesley “only after successfully suing the College for racial discrimination” — is partly false, but substantially true. The preponderance of the evidence establishes, and indeed it is undisputed, that Martin did sue the College for racial discrimination; that in that suit he did allege mistreatment with respect to his tenure decision; and that the suit ended in a manner that he considered successful. It is also true, according to Martin, that the College preferred not to grant him tenure and sought to avoid doing so for reasons and by means he considered illegitimate, but changed its position under pressure in the context of student unrest. What is inaccurate in the statement published is the implication of timing and causation as between the lawsuit and his tenure; the suit occurred well after his tenure, and thus could not have caused it.[10] The conclusion Roy drew from the erroneous statement, however, that the College might be exercising particular restraint in dealing with Martin for fear of being sued, follows at least as strongly from the actual facts as it would from the erroneous version. In the context of the article, the importance of the statement lay in its support for this conclusion. In that respect, insofar as material to the context in which it was made, the statement was true. See Dulgarian v. Stone, 420 Mass. at 848; Milgroom v. News Group Boston, Inc., 412 Mass. 9, 13 (1992).
A statement is defamatoiy if it “would tend to hold the plaintiff up to scorn, hatred, ridicule or contempt, in the minds of any considerable and respectable segment of the community.” Milgroom v. News Group Boston, Inc., 412 Mass. at 12; Stone v. Essex County Newspapers, Inc., 367 Mass. 849, 853 (1975). The statement must be read in its context, and its defamatory tendency must be “specific and significant.” Tartaglia v. Townsend, 19 Mass.App.Ct. 693, 698 (1985). No reasonable reading of the statement in issue here could have the required effect. Contraiy to Martin’s contention, the statement does not say that Martin was in any way unqualified for his position; on the contrary, by referring to a successful suit for discrimination, the statement necessarily implies that he was indeed qualified, and so established in court. Nor could any reasonable reader construe the statement as suggesting that Martin gained tenure as a result of affirmative action, as Martin suggested in his trial testimony; it simply does not say anything of the kind.[11] Finally, although the statement might be read as implying that Martin had intimidated the College and thereby influenced its conduct to his benefit, the intimidation suggested is solely by means of action that it is entirely lawful and fully in accord with public policy — the bringing of a well-founded suit to remedy a violation of his statutorily protected rights. See Peck v. Wakefield Item Co., 280 Mass. 451, 454-55 (1932). There is simply nothing in the statement that a reasonable reader could interpret in a manner that would damage Martin’s reputation among any respectable segment of the community.
Nor has Martin met his burden of proof of actual malice, as he must do to recover for libel as a public figure. New York Times Co. v. Sullivan, 376 U.S. 254, 279-80 (1964); Elm Medical Laboratory, Inc. v. RKO General, Inc., 403 Mass. 779, 786 (1989). During the discovery phase of this case, Martin presented to opposing counsel, and filed with this Court, a document captioned “Stipulation,” stating, in its entirety, “Plaintiff hereby stipulates that he is a public figure.”[12] Before trial, Martin argued, without moving for relief from the stipulation, that his public figure status did not extend to the subject matter of this case, but was limited to the area of Africana Studies, which he sought to distinguish from the statement in issue here. *527 The Court rejected that argument because it lacked any support in the stipulation itself, and was in direct conflict with the filing of the stipulation in this action. Accordingly, the Court ruled in advance of trial that Martin is a public figure for purposes of this case.
Even without the stipulation, the Court would so conclude, based on the facts as found supra. The evidence establishes beyond any room for doubt that, at the time of the publication in issue, Martin was the topic of widespread public controversy. He actively and voluntarily participated in the controversy by making a public speech and publishing and disseminating writings of his own on its subject matter. To characterize the controversy as limited to Martin’s use of a particular book in his class is to misconstrue its substance. The essence of the point made by Martin’s critics was that The Secret Relationship was so lacking in scholarly merit, and so infused with ulterior purpose, that his choice to present it to his students as genuine history revealed him as more propagandist than scholar. Thus, Martin’s merit as a scholar, and his qualifications for his position at Wellesley, were central to the public controversy about him. If, as Martin contends, the inaccuracy in Roy’s article could be construed as reflecting negatively on Martin’s qualifications for his tenured faculty position, then the statement fell directly within the subject matter of the public controversy.
To show actual malice, Martin must prove, by clear and convincing evidence, that Roy published the statement either with actual knowledge that it was false, or with reckless disregard for its truth or falsity. To establish reckless disregard, he must present evidence sufficient to support an inference that Roy “in fact entertained serious doubts as to the truth” of the statement. McAvoy v. Shufrin, 401 Mass. at 599.
The evidence Martin offered to show malice consisted of (1) his inference that Roy’s confidential source was Alyson Todd, (2) his own subjective opinion that Todd was hostile to him,[13] (3) Roy’s acknowledged friendship with Todd, from which Martin infers that Roy knew of her alleged hostility to Martin, and (4) Roy’s failure to take various possible steps to corroborate the information. From this Martin reasons that Roy must either have known that the information provided was erroneous, or have actually harbored serious doubts as to its accuracy.
As indicated supra, the inference that Todd was the source is reasonable from the evidence presented, although by no means inescapable. Assuming that she was, the rest of the chain nevertheless fails at every link. The evidence indicates that Todd disagreed with what she understood to be Martin’s views, and disapproved of his conduct, but no competent evidence indicates that she held any personal hostility to Martin, that she wished him ill on a personal level, or that she had any inclination to, or actually did, deliberately convey false information about him. Still less does the evidence indicate that Roy had any awareness of or any reason to suspect any such attitude or conduct by Todd. To the contrary, the most likely scenario suggested by the evidence is that one or more Wellesley College faculty members or administrators conveyed to Todd their understanding of the suit that Martin actually did bring against the College, but that somewhere in the transmission of the information from that source or sources through Todd to Roy, a good faith misunderstanding occurred, with the result that the information was conveyed inaccurately. As set forth in the findings, supra, Roy genuinely believed the information to be true, based on his past experience with the source as reliable and the plausibility of the statement in light of other information he had about Martin and the College. Roy’s genuine belief in the accuracy of the statement establishes the absence of actual malice, and defeats this element of the claim.
Finally, Martin has utterly failed to prove that he suffered any damage to his reputation as a result of the statement. Martin’s claimed subjective sense that the statement demeaned his position at the College, and his fear that the statement would somehow endanger his livelihood, even if credited,[14] would not satisfy his burden of proving damages. Martin produced no evidence whatever that the particular statement that forms his cause of action in this case had any negative effect whatever on even one person’s opinion of him. See generally, Lakian v. Globe Newspaper Co., 399 Mass. 379, 381-84 (1987); Stone v. Essex County Newspapers, Inc., 367 Mass. at 860. For each of these reasons, Martin has failed to meet his burden of proof of the elements of his claim, and judgment must enter for the defendant.
CONCLUSION AND ORDER
For the reasons stated, it is hereby ORDERED that JUDGMENT shall enter for the Defendant.

This difference in timing of tenure consideration is not explained in the evidence; I infer that it arose from the two having entered the faculty at different levels, based on previous teaching experience or other factors.

The evidence does not establish whether Martin or anyone else made any threat of litigation at the time of the tenure decision. Martin testified that he does not recall having done so.

The book itself was not offered in evidence.

This account appears in a book Martin published in December of 1993 entitled The Jewish Onslaught: Despatches from the Wellesley Battlefront.

It appears that vigorous debate had occurred in various journals on the scholarly merit of Afrocentrism, with particular reference to Martin, well before 1993. In his March 4, 1993, speech, Martin referred to "two years of intense attacks ... in the national media, in the local press, in student publications and via electronic mail transmitted nationally.”

During the discovery phase of this case, Martin moved to compel Roy to identify this confidential source. The Court (Neel, J.), observed that the information Roy had provided in his deposition created “a strong likelihood that the plaintiff may obtain the identity of the confidential source he seeks by deposing a relatively small number of current or former *528 members of the Counterpoint staff.” Accordingly, the Court ordered that Martin conduct further discovery in an effort to identify the source other than from Roy, and that he report to the Court on those efforts, 6 Mass. L. Rptr. No. 6, 130 (January6, 1997) (Neel, J.). Martin failed to conduct any such discovery or to submit any such report. For that reason, and without making any ruling on the existence or scope of any privilege, at trial this Court ruled that Martin had waived any right to compel Roy to disclose the source, and sustained objections to questions to Roy on that subject.

Nothing in the evidence indicates whether a skilled user, knowing only the names of the parties, could have found any information in Lexis/Nexis about a suit in a trial court in the 1970s, such that the absence of information would warrant doubt as to the existence of the suit.

 Todd expressed such views in a column entitled “Combat in Academe: Blacks and Jews and All the News” published in the May-June 1993 issue of a journal entitled Heterodoxy: Articles and Animadversions on Political Correctness and Other Follies. No evidence indicates that Roy ever read or was aware of that article.

The book identifies its publisher as “The Majority Press,” giving its address as a post office box in Dover. Martin acknowledged in his trial testimony that he is the principal of The Majority Press.

It is by no means established that fear of litigation did not play a role.

 -^This is not to suggest that such a statement would be defamatory.

The Court’s record indicates that the stipulation was offered at the beginning of Martin’s deposition, and caused opposing counsel to forego planned questioning on topics related to his public figure status.

This opinion, according to Martin’s testimony, was based on (1) his assumption that Todd associated him with accusations of racism made against her by certain students on an occasion the previous year when she had expressed opposition to a proposal to invite Al Sharpton to speak at the College: and (2) his belief that Todd was closely associated with Professor Mary Lefkowitz, who had expressed strong criticism of his Afrocentric views. Neither of these theories, however, finds any support in the evidence.

Martin’s testimony provided strong reason not to credit his assertions regarding these feelings. His failure ever to contact either Roy or Counterpoint to correct the error or request publication of a retraction is at least inconsistent with his present contention that the error was of serious concern to him. Further, he testified to his belief that the various comments about him in the news media at the time questioning his scholarship, accusing him of anti-Semitism, and calling for his firing, while they may have damaged his reputation in certain limited communities, particularly among Jews, enhanced his reputation in other communities, and generated an outpouring of support for him among those whose opinion he most values. It is at least implausible that he genuinely holds that belief with respect to those comments, while at the same time believing that this particular statement posed a serious threat to his reputation among persons whose opinions matter to him.