Sosman, J.
Plaintiff Wanda Nelson has brought the present action for defamation, negligent infliction of emotional distress and reckless infliction of emotional distress stemming from the publication of an article in the Middlesex News, which is published by defendant Community Newspaper Company. Defendant has moved for summary judgment on all claims based on the fair report privilege. For the following reasons, the motion is ALLOWED.
Facts
In early February 1997, a Massachusetts State Police investigation of plaintiff Wanda Nelson uncovered that she had several outstanding felony warrants and that she had used various aliases. Among the aliases that the police were concerned with was the name “Shannon Booker.” At the time, a woman known as “Shannon Booker” was on parole on homicide and firearms charges. The police did not know whether Nelson was indeed the same person as “Shannon Booker,” but they entertained suspicions that she might be.
On February 21, 1997, the State Police and the Milford Police went to arrest Nelson at her home, 13 Grove Street in Milford. Because of concerns about Nelson’s record, the arrest warrant was executed by a Special Tactical Operations Team (referred to as the “STOP Team”), dressed in camouflage and carrying high-powered weapons. However, the STOP Team mistakenly entered the house at 17 Grove Street next door to Nelson’s and ordered the occupants — one Katrina Anderson and her three young children — to the ground at gunpoint. Upon realizing their mistake, the STOP Team left the Anderson household, went next door to the correct address, and arrested Nelson.
The incident (and in particular the forcible treatment of the Anderson family that had resulted from *178 police error) came to the attention of the press. On March 3, 1997, the State Police Public Affairs Unit issued the following notice to the media:
The Massachusetts State Police has received several media inquiries relative to our involvement in the execution of a murder arrest warrant in the Town of Milford on Friday, February 21, 1997.
Captain Robert J. Bird of the State Police Public Affairs Section along with Chief Vincent Laberto of the Milford Police Department will speak about the incident at 2:00 p.m. today (3/3/97) at State Police General Headquarters in Framingham.
Harry Weber, a reporter for the Middlesex News, attended the March 3 press conference. At that conference, Captain Bird read from a prepared statement and answered questions. His prepared statement included the following:
As a result of an investigation by a Trooper assigned to the Grafton State Police barracks, information was developed that a woman named Shannon Booker, who was wanted for violation of parole, after serving time for murder, manslaughter and firearms offenses, was now living at 13 Grove Street in Milford under the alias of Wanda Nelson. This information included a possibility that a number of other known criminals might also be located at that location and there might also be two pit bulls at the house.
A decision was made to utilize our tactical unit, known as the STOP Team, to effect this arrest, in order to do so quickly and to minimize the possibility of anyone being injured.
The Milford Police Department was notified of this action, and two of their officers assisted in the planning and completion of the operation. Unfortunately, through an error in communication, the residence at number 17 Grove Street was first entered during this action. The arresting officers immediately realized their error and went next door to the correct residence, number 13, where Shannon Booker was located and arrested.
Captain Bird’s statement was based on his reading of the arrest report, and his statement that the person arrested was “Shannon Booker," and that Booker used the name “Wanda Nelson” as an alias, was a mistaken interpretation of the arrest report’s account of Nelson’s possible use of aliases. The underlying arrest report that Bird had misread was not made available to the media, as the investigation itself was still ongoing.
After the press conference, reporter Weber conducted some other interviews in preparation for a story concerning the police raid on the wrong house. He spoke with Katrina Anderson, Anderson’s lawyer, other members of the Anderson family, and a spokesperson for the American Civil Liberties Union. Weber also interviewed a court official, obtaining information about the bail that had been set on the individual arrested and the identity of her employer. Weber also contacted the Milford District Court seeking to locate the attorney representing “Shannon Booker,” but obtained no information from the court. He did not ask about the attorney representing “Wanda Nelson,” nor seek any other information about a “Wanda Nelson,” because he had understood from Captain Bird’s statement that the person arrested was “Shannon Booker” and that “Wanda Nelson” was only one of Booker’s aliases.
On the day before the press conference, and again immediately after the press conference,' Weber also interviewed Sergeant Barbara Bennett of the State Police Public Affairs Unit. Just as Captain Bird had done at the press conference, Bennett erroneously stated that “Shannon Booker” was the suspect the police had been looking for. Bennett also stated that “Booker” had been considered armed and dangerous, that police had believed she was holed up in her house with guns and drugs on the night the arrest warrant was executed, but that no guns or drugs had been found in the home following the arrest.
In his work as a reporter, Weber had received information from both Captain Bird and Sergeant Bennett on other State Police matters. They had never provided him with inaccurate information in the past, and he did not doubt the accuracy of the information they had provided him on March 3 concerning this botched raid of the Anderson home.
On March 4, the Middlesex News ran Weber’s story on the raid with the headlines “Her house mistakenly raided, woman jailed” and “Woman whose house was raided thinks arrest is pressure tactic.” The story described the mistaken entry into the Anderson home and the potential for Anderson bringing a lawsuit as a result of the incident. In the* wake of the incident, Anderson had been arrested on outstanding warrants for larceny by check (which dated from 1991). Weber’s article reported on Anderson’s suspicions that the police had resurrected these warrants in retaliation for her threats to sue. The story reported that the police had held a press conference, described the conference at some length, and quoted both Captain Bird and Sergeant Bennett apologizing to the Anderson family. The article ran with a photograph of the press conference with the caption, “Milford Police Chief Vincent Liberto and State Police Captain Robert Bird speak during a press conference yesterday about the mistaken State Police raid on Katrina Anderson’s Milford home.”
In the course of this article about the mistaken STOP Team entry into the Anderson home, Weber said the following about the person later arrested by the police:
Their warrant was for Shannon Booker, who lives at 13 Grove St., a house next door. Booker, who was picked up immediately after the botched raid, was *179 on parole for murder and was wanted on several outstanding warrants.
Booker, the suspect police were looking for, had 16 different aliases and was considered armed and dangerous, police said. Bennett said the STOP team tactics were necessary because Booker, who was living in Milford under the alias Wanda Nelson, was on parole for murder, manslaughter and firearms violations, and was believed to be holed up inside her home with guns and drugs the night of the raid.'
No guns or drugs were found in Booker’s home when police arrested her immediately after raiding Anderson’s house, Bennett said. But she had three active warrants against her for forgery, uttering and other charges, Bennett said. Booker, a drug-abuse counselor at Blair House in Milford, was being held yesterday on $20,000 cash bail.
The identification of “Shannon Booker” as the person the police were seeking to arrest, the information about Booker’s record, and the information about Booker’s use of the alias “Wanda Nelson” came from Captain Bird’s statement at the March 3 press conference. The report of police fears about Booker being “armed and dangerous” and “holed up inside her home with guns and drugs” came from Weber’s March 3 interview of Sergeant Bennett.
Plaintiff Wanda Nelson is not Shannon Booker, and Wanda Nelson’s own criminal record, although extensive, does not include the homicide and firearms offenses on Shannon Booker’s record. As such, the Weber article is erroneous when it mistakenly identifies Nelson as Shannon Booker and attributes to her Shannon Booker’s homicide and firearms convictions.
Discussion
Defendant relies on the “fair report privilege” as a defense to Nelson’s claims of defamation and infliction of emotional distress. The fair report privilege “allows those who fairly and accurately report certain types of official or government action to be immune from liability for claims arising out of such reports.” ELM Medical Laboratory, Inc. v. RKO General, Inc., 403 Mass. 779, 782 (1989). The rationale for the fair report privilege is that “(1) the public has a right to know of official government actions that affect the public interest, (2) the only practical way many citizens can learn of these actions is through a report by the news media, and (3) the only way news outlets would be willing to make such a report is if they are free from liability, provided that their report was fair and accurate.” Id., citing Sibley v. Holyoke Transcript-Telegram Publishing Co., 391 Mass. 468, 470-71 (1984). The fair report privilege provides immunity from defamation claims, as well as from any other tort claims that stem from the defendant’s report of official action. “A privilege which protected an individual from liability for defamation would be of little value if the individual were subject to liability under a different theory of tort.” Correllas v. Viveiros, 410 Mass. 314, 324 (1991) (privilege for statements made in the course of judicial proceedings protected defendant from intentional infliction of emotional distress claim as well as defamation claim).
In order for a defendant to invoke the fair report privilege, the publication must consist of “a report of an official action or proceeding or of a meeting open to the public that deals with a matter of public concern” and the report must be “accurate and complete or a fair abridgement of the occurrence reported.” Jones v. Taibbi, 400 Mass. 786, 794-95 n. 11 (1987), quoting Restatement (Second) ofTorts §611 (1977).
The fair report privilege protects reports of “official” actions and statements, but not reports of “unofficial statements.” Id. at 796. Here, the article’s statement that Nelson was really “Shannon Booker” and that she had served time for murder, manslaughter and firearms convictions was based on Captain Bird’s statement at a State Police Public Affairs Unit press conference. Such press conferences qualify as official actions. Indeed, the Jones case noted that reports of statements made at a police department press conference would qualify for the fair report privilege. 400 Mass, at 797.
The alleged defamatory statement that plaintiff was “considered armed and dangerous” and was “believed to be holed up inside her home with guns and drugs” was based on the statements of Sergeant Bennett during her March 3 interview with Weber.[1] Although those specific statements were not made as part of the actual press conference, Bennett was an official spokeswoman for the State Police as part of its Public Affairs Unit being interviewed by the press in the immediate aftermath of the press conference. Reports of interviews of such officials, whose job is to inform the public of the agency’s action and position, also qualify as “official” for purposes of the fair report-privilege. See ELM Medical Laboratory, supra, 403 Mass, at 783 (fair report privilege would extend to reports of health warnings issued by the Department of Health whether they were issued “in a news release or in interviews with officials”).
With regard to both Captain Bird’s and Sergeant Bennett’s statements, it is also undisputed that Weber’s article fairly and accurately reported what those two officials had announced with respect to this particular arrest. The mistake as to plaintiffs identity (i.e., the erroneous statement that she was really “Shannon Booker” and that she therefore had the criminal record of “Shannon Booker”) was a mistake made and announced by Captain Bird and repeated by Sergeant Bennett. Weber’s subsequent story repeated that mistake, but it was a “fair and accurate” report of what State Police officials had stated. To qualify as “fair and accurate” for purposes of this privilege, the article “need not have duplicated or tracked the official statement" as long as it “gave a *180 rough-and-ready summary that was substantially correct.” MiGi, Inc. v. Gannett Massachusetts Broadcasters, Inc., 25 Mass.App.Ct. 394, 396 (1988). Here, the alleged defamatory statements about Nelson were precisely what Captain Bird and Sergeant Bennett had stated about her, without further elaboration by the reporter who wrote the article. As such, the article was a “fair and accurate" report of the official statements of the State Police.
Plaintiff argues that her identity and criminal record were not matters of public interest and that repetition of information on those subjects that had been announced by the State Police therefore does not qualify for the fair report privilege. The privilege does not require reporters to single out only those precise statements at a press conference that are specifically germane to the matter of public interest that led to the press conference in the first place, and plaintiff points to no case law overriding the fair report privilege based on such a distinction. Moreover, the allegedly violent criminal record of the person that the police were seeking to arrest that night was highly germane to the subject matter of this particular press conference. The public’s interest stemmed not only from the fact that the police had gone into the wrong house, but from the fact that they had done so with a camouflaged, heavily armed team. In their statements to the media, the State Police explained the circumstances that had led them to execute the warrant with the degree of force they had. Those circumstances included their (mistaken) belief that the suspect had a violent past and the fear that she had guns and drugs in her home. The police statements about plaintiff and what they mistakenly thought was her identity, her past, and her current armed condition were not extraneous or irrelevant to the matter of public interest that had led to the press conference in the first place. They were part and parcel of the police justification for what would otherwise seem like an excessive display of force in the execution of the arrest warrant.
Plaintiff also argues that defendant was “negligent” in not investigating her true identity before publishing the story. In order to overcome the fair report privilege, plaintiff would have to show malice, and not just negligence. Indeed, “according to an emergent rule, the privilege should not be forfeited even if the party making the report knew the statement to be false.” MiGi, Inc., supra, 25 Mass.App.Ct. at 397, citing Restatement (Second) of Torts §611 comment a (1976) and Prosser & Keeton, Torts §115, at 836-38 (5th ed. 1984). Here, plaintiff has no evidence of any form of malice. A demonstration of how, by further investigation, Weber could have uncovered the mistake in the official State Police version is not evidence of malice or even of negligence. Nor has plaintiff pointed to anything in the State Police version that alerted, or even should have alerted, Weber to the likelihood that there was any error in the official report as to who the police were seeking to arrest that night. The error as to the intended arrestee’s identity and criminal record had been repeated by two separate official police spokespersons, with whom Weber had worked before, and who had always given Weber accurate information in the past. Plaintiff has no evidence of malice that would overcome the fair report privilege.
ORDER
For the foregoing reasons, defendant’s motion for summary judgment is ALLOWED and it is hereby ORDERED that judgment be entered in favor of defendant Community Newspaper Co., Inc.

 Where the article stated, in the very next sentence, that “(n]o guns or drugs were found in Booker’s home when police arrested her,” the earlier statement about police beliefs on those subjects is not even defamatory. The article, read in its totality, shows that the police were wrong in their assessment with respect to the presence of guns and drugs at Booker's/Nelson’s home and that Booker/Nelson was not in fact “armed and dangerous” on the night in question. The issue of whether a statement is reasonably susceptible of a defamatory meaning is to be decided based on a review of the statement in its totality and not just a review of isolated phrases or sentences. Foley v. Lowell Sun Publishing Co., 404 Mass. 9, 11 (1989). Read in its totality, the article does not state that plaintiff was armed and dangerous or that she had guns and drugs in her home. Rather, it states clearly that the police suspicions as to guns and drugs at her home turned out to be erroneous. In context, the article reported a grievous error on the part of the police in the execution of this arrest warrant and, to the extent that the police sought to justify the use of force by reference to concerns about “guns and drugs” in the home of the person they intended to arrest, the article reports that those concerns were unfounded. This aspect of the article is simply not defamatory.