JAMES F. HOWELL *vs.* THE ENTERPRISE PUBLISHING COMPANY, LLC, & others.[1]

Plymouth. September 9, 2009. - January 7, 2010.

Present: MARSHALL, C.J., IRELAND, SPINA, COWIN, CORDY, BOTSFORD, & GANTS, JJ.

*Constitutional Law,* Libel and slander, Privacy. *Libel and Slander. Privacy. Emotional Distress.*

Discussion of the so-called "fair report privilege," which protects from liability for defamation one who reports on allegedly defamatory statements and actions, so long as the statements or actions are official and so long as the report about them is fair and accurate. [650-654]

In a civil action alleging, inter alia, that the defendant newspaper publisher defamed the plaintiff when it printed articles concerning his termination from his employment as the superintendent of a town's sewer department, the judge erred in denying summary judgment in favor of the defendant, where the articles that the defendant published reported on official actions, proceedings, and statements [654-661]; where the reports were accurate except for one statement in one report, and the incorrect statement was not made with the requisite mental state needed to subject its author to liability [661-664]; and where the reports were fair, and ancillary reporting did not render them unfair [665-670]; further, the uncontroverted facts on the summary judgment record demonstrated that the allegedly libelous statements contained in an article whose apparent purpose was to express the opinion of its author were true, and the remaining portions of the article were statements of opinion based on disclosed nondefamatory facts [670-672]. SPINA, J., concurring in part and dissenting in part.

In a civil action arising from the defendant newspaper company's publication of articles concerning allegations of the plaintiff's misconduct as a public employee, in which the plaintiff alleged, inter alia, that the defendant authors of the articles intentionally inflicted emotional distress, the judge erred in denying summary judgment in favor of the authors of the articles, where, with the exception of a single sentence in one report, all of the articles fell within the so-called "fair report privilege," and where that one statement did not constitute extreme and outrageous conduct sufficient to support such a claim. [672-673]

CIVIL ACTION commenced in the Superior Court Department on December 27, 2005.

The case was heard by *Frances A. McIntyre,* J., on a motion for summary judgment.

[1]Elaine Allegrini and Allan Stein.

After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.

*Jonathan M. Albano* (*Laura K. Langley & Peter J. Caruso* with him) for the defendants.

*John G.H. Coster* for the plaintiff.

*Paul Bender, Michael R. Klipper, & Christopher A. Mohr*, of the District of Columbia, *& William S. Strong & Amy C.M. Burke*, for The Associated Press & another, amici curiae, submitted a brief.

CORDY, J. James Howell served as the superintendent of the sewer department for the town of Abington (town). On May 9, 2005, he was placed on administrative leave, and he was eventually fired from his position. The catalyst for Howell's discipline was the discovery of inappropriate images on computers owned by the sewer department. Almost immediately after he was placed on administrative leave, reporters working for The Enterprise Publishing Company, LLC, began covering Howell's case and continued to do so for several months. Howell filed suit against The Enterprise Publishing Company, LLC, and two of its reporters (collectively, the Enterprise), alleging that coverage of his termination defamed him because it reported that images found on his work computers were "porn" or "pornography"; it linked him to an official in another town accused of possessing child pornography; it wrongly reported that charges of conflict of interest had been upheld against him; and it implicitly accused him of the fraudulent collection of unemployment benefits. Howell's complaint also alleged that the Enterprise's conduct constituted an intentional infliction of emotional distress, and that the Enterprise violated his privacy rights set forth in G. L. c. 214, § 1B.

The Enterprise moved for summary judgment. With respect to the defamation claim, the Enterprise contended that Howell could not satisfy his burden to show that the articles published by the Enterprise contained materially false accusations of fact; and, even if some statements in the articles were false, the reports overall were fair and accurate summaries of official action protected by the fair report privilege. A Superior Court judge denied the motion for summary judgment on March 9, 2007, concluding that whether the articles were both fair and

accurate were issues for the trier of fact to decide, as was the question of the reporters' intent on the claim of intentional infliction of emotional distress. As to the privacy claim, the judge concluded that a reasonable jury could find that reporting on Howell's unemployment or insurance payment was not a matter of legitimate public interest. The Enterprise appealed. The Appeals Court affirmed the denial of summary judgment on the claims of defamation and the infliction of emotional distress, and reversed the denial on the invasion of privacy claim. See *Howell* v. *Enterprise Publ. Co.*, 72 Mass. App. Ct. 739, 748-754 (2008). We granted the Enterprise's application for further appellate review on the defamation and emotional distress claims. We reverse the order of the Superior Court judge and direct that judgment be entered for the Enterprise.[2]

1. *Background.*[3] The misuse of municipal computers was a topic of intense public interest in the town in 2005, after allegations emerged that an official in the neighboring town of East Bridgewater stored child pornography on his computer. Consequently, the Enterprise chose to follow Howell's case with special interest. Between May and November, 2005, the Enterprise published eleven articles referencing Howell.

a. *Initial investigation and administrative leave action.* On Friday, May 6, 2005, a member of the board of sewer commissioners discovered "inappropriate images" stored on the desktop computer in Howell's office. The commissioner notified Mark Jamieson, the chairman of the sewer commission, who in turn traveled to Howell's office to view the images. Finding them generally inappropriate and, in part, "pornographic," Jamieson met with the town manager, Philip Warren, on May 9, 2005. Jamieson told Warren that Howell's computer contained images that were inappropriate for the workplace and possibly criminal.

---

[2]We acknowledge the amicus brief filed by The Associated Press and Reed Elsevier, Inc.

[3]The factual background is drawn from the summary judgment record, which included, among other things, the articles published by the Enterprise, answers to interrogatories, and transcripts from the municipal proceedings concerning Howell. The material facts are largely undisputed, and in any event, we have viewed the summary judgment record in the light most favorable to Howell, the nonmoving party. See *Attorney Gen.* v. *Bailey*, 386 Mass. 367, 370-371, cert. denied, 459 U.S. 970 (1982).

He also told Warren that the computer contained files relating to Howell's personal business. Based on Jamieson's report, Warren contacted the town's chief of police, who dispatched officers to seize the desktop computer. Together, Jamieson, Warren, and two police officers went to Howell's office. They telephoned Howell and, on his arrival, handed him a letter advising him that he was being placed on administrative leave pending a meeting of the sewer commission to determine whether disciplinary action should be taken for "improper use of Town-owned equipment." The letter informed Howell that the meeting would occur on May 11, 2005. The decision to place Howell on leave was made by Jamieson in his capacity as chairman of the sewer commission, and the letter advising Howell of that fact was signed by Jamieson in that same capacity. The police took possession of both Howell's office desktop computer and the town-owned laptop computer he used at home.

On May 11, 2005, before the sewer commission held its meeting, the Enterprise published its first article (May 11 article). Under the headline, "Officials find porn on town computer," the article reported that "[v]eteran Sewer Superintendent James F. Howell is on paid administrative leave amid allegations that pornography and records from a business he owns were found on Sewer Department computers." This information came to the Enterprise from an anonymous source, although the Enterprise also obtained on-the-record statements from Warren confirming that Howell had been placed on administrative leave. The article went on to credit the anonymous source for the following details:

> "A town official close to the investigation who spoke on condition of anonymity said the allegations against Howell include improper use of town equipment for personal business. The source declined to specify the type of equipment that was used but alluded to a possible criminal investigation by Abington police."

The article also quoted the chief of police, who stated that "[t]here is absolutely nothing criminal at this point. It's the town manager's issue to deal with right now."

Finally, in what would become a common practice in future articles about Howell, the Enterprise discussed the unrelated but

similar series of events in East Bridgewater where, earlier that year, investigators discovered child pornography on the East Bridgewater-owned computers of Frank Savino, East Bridgewater's treasurer-collector. The May 11 article dedicated its final four paragraphs to the Savino affair, describing it as "another recent incident," but making no direct comparisons between Howell and Savino.

The May 11 meeting of the sewer commission was held in executive session and concluded with no change in Howell's administrative leave status. Sometime after the meeting, the police reviewed the contents of the two computers and concluded that they contained nothing illegal. Additionally, Jamieson directed Warren to engage the services of MX Consulting Services, Inc., a computer forensics company, to analyze the contents of the two seized computers.

b. *Sewer commission hearing.* On July 12, 2005, Jamieson sent Howell a letter notifying him that the sewer commission would hold a formal hearing on July 19, 2005, to consider disciplinary charges. The letter listed four charges: misuse of town property for maintaining personal business files on a town-owned laptop computer; misuse of town property for possessing "photographs and cartoon-style pictures of a pornographic nature, as well as other inappropriate and obviously non-work related material" on the town laptop and desktop computers; distributing objectionable material to subordinates; and violating conflict of interest laws, including G. L. c. 268A, § 23 (*b*) (2), for ordering personal items at a discount through the sewer department vendor. The words, "CONFIDENTIAL — NOT A PUBLIC DOCUMENT," were printed in bold, underlined type across the top of the letter.

On July 19, 2005, the sewer commission held the disciplinary hearing in executive session.[4] In addition to a formal reading of the charges set out in the July 12 letter, the sewer commission heard testimony from Howard Cathcart, an employee of MX

---

[4]General Laws c. 39, § 23A, defines "[e]xecutive session" as any meeting of a government body that is closed to certain persons for deliberation on certain matters. General Laws c. 39, § 23B (2), permits a meeting to be held in executive session and for the records of such sessions to be kept secret for a limited period of time. Executive sessions are authorized for discussions of personnel matters. No provision in that chapter makes disclosure of executive session proceedings unlawful.

Consulting Services, Inc.; Howell's executive assistant, Kristen O'Sullivan; Warren; Jamieson; and Howell.

Cathcart testified that Howell's computer contained pictures "considered explicit in nature" with "partial or full nudity," of which "some" were "pornographic." He also revealed that two adult Internet Web sites had been visited during two workdays. Cathcart described finding files relating to Howell's personal business stored in a popular accounting software program on both computers and noted that the software was not used for town purposes. Cathcart estimated that ninety-nine per cent of the files on both computers were not related to town business. O'Sullivan testified that Howell had sent her several of the images found by Cathcart and that they made her feel "[u]ncomfortable."[5]

On July 20, 2005, the Enterprise published an article headlined, "Abington board mum after porn hearing" (July 20 article). The article's thrust was that details of the closed door proceedings were not forthcoming. Much of the article was devoted to describing the uniform reticence of the hearing's participants. Thus, aside from characterizing it as a "porn hearing," the article contained little substantive reporting: the Enterprise again referred to the "allegations" against Howell and noted the police had found "nothing illegal" on the computers. The only information reported from behind the hearing room's closed doors was that the charges were contained in a "three-page document . . . not being made public or available to the press."[6]

---

[5]Howell, for his part, testified that the presence of inappropriate images on his computer was inadvertent. Because he used his personal electronic mail (e-mail) account for both town and personal business — the propriety of which was not challenged — he would receive messages from personal acquaintances, some of which included electronic attachments. Howell further testified that he would open the attachments without knowledge of their nature and that he was unaware that in so doing he was also saving a copy of the attachment onto his computer's hard drive. Thus, Howell disagreed that the images were "in the workplace" because he believed they were contained in his personal e-mail account only. Howell explained that he had come to store personal business files on his computer simply as an innocent means of backing them up, that he had attempted to remedy his accidental purchase of personal business items with the town's discount rather than his own, and that his use of external storage devices for his town work accounted for the absence of town business on the laptop computer.

[6]This appears to be a reference to the July 12 letter sent to Howell. The

c. *Howell's termination.* Following the July 19 hearing, the sewer commission received briefs from the parties and met again in executive session on August 2, 2005, to deliberate. At that meeting, the sewer commissioners voted and "sustained" three of the charges leveled against Howell: both charges of misusing town property and the charge of distributing objectionable material to a subordinate. The fourth charge, a violation of the conflict of interest laws for using the sewer department's discount to order personal items through one of its vendors, was not sustained. As a consequence of the sustained charges, the commissioners voted to terminate Howell's employment immediately. The results — including the official vote tallies — of the meeting were subsequently memorialized in a letter sent to Howell.

Once again, the Enterprise had the story. The headline on August 3, 2005, read, "Abington official fired over computer porn," and was followed by the fullest account of the saga to date (August 3 article). The Enterprise reported that Howell had been fired after the commission sustained three charges, including that Howell "kept pornography and private business files on town computers." The Enterprise attributed most of the details in its reporting to an anonymous commissioner who divulged that Howell had spent sewer department money to buy the laptop computer and that over ninety-nine per cent of the files stored on the laptop computer were personal business files and pornography downloaded from the Internet. According to the anonymous commissioner, the laptop computer stored 150 images of "pornography . . . both sexually explicit cartoons and still-life photographs, and 12 videos." He also revealed that Howell had been charged not only with possessing pornography downloaded from the Internet, but also with distributing objectionable material to a female subordinate, and that his computers were connected to the sewer department's network in a manner that enabled other employees of the sewer department to gain access to the files containing the pornographic images.

The anonymous commissioner went on to offer his view on the matter:

" 'These were images you wouldn't want your children

---

charges read into the record at the hearing were identical to those enumerated in the letter.

to see,' the commission member said. Commission members would not say who came forward with the allegations against Howell. 'The point is, it happened. The board, acting on behalf of the town, was forced into action and would have been negligent if it had not acted. The potential is still very real for a sexual harassment lawsuit,' the commission member said. The source added that Howell 'thinks he did nothing wrong.' "

In the article's second paragraph, the Enterprise again referred to the Savino affair, writing that "Howell was the second town official in the region to be fired in the past six weeks for using town computers to download and store pornography from the Internet." The article's last two paragraphs were also dedicated to a brief discussion of Savino. In between, the Enterprise included several paragraphs about the town's computer and sexual harassment policies.

Howell appealed from the sewer commission's decision to the Abington board of selectmen (board), and on August 5, 2005, the Enterprise reported that he would do so (August 5 article). The August 5 article discussed the appeal process and repeated the disclosures by the anonymous commissioner in the August 3 article.

d. *Board hearings.* The board held a hearing on August 23, 2005. The hearing was held in open session at Howell's request, and was televised. The board heard testimony from Warren, Cathcart, O'Sullivan, and Jamieson. As a result, the entire record of the proceedings to date, including a slide show of images extracted from Howell's computers, was essentially made public.[7] The meeting adjourned at 9 P.M. and was scheduled to continue on September 21, 2005.

The Enterprise published an account of the hearing on August 24, 2005 (August 24 article). It opened, "Selectmen on Tuesday were shown dozens of photographs of nude and topless women and other sexual images that fired Sewer Department Superintendent James F. Howell is accused of keeping on town computers." It referenced Savino again: "It was the second such hearing in

---

[7]Howell chose not to testify at the board's hearing; however, a transcript of all the testimony taken at the hearing before the sewer commission on July 19 (including that of Howell) was entered in evidence.

recent weeks. On June 21, East Bridgewater selectmen and other officials sat through a slide show of sexual images before firing [Savino] . . . ." The Enterprise listed the charges against Howell, including "[d]ownloading pornography from the Internet" and sending it to a subordinate. The article described the slide show as "includ[ing] family snapshots, bar scenes, nude and scantily clad women, a baby holding a Playboy magazine, a sexually suggestive photo of former President Bill Clinton and other material of a sexual nature." It recounted Cathcart's testimony about the contents of the computers and the two adult Internet Web sites visited. At the end of the article, the Enterprise described Howell's attorney's challenge to Jamieson to identify which of the photographs he considered to be pornographic.

Three days later, the Enterprise published an article by Steve Damish, the newspaper's "metro editor," under the headline, "Town Hall's uglier side" (Damish article). While the article reported that the August 23 hearing had taken place, its apparent purpose was to express the opinion of its author. Damish devoted most of his column to wringing his hands over the state of municipal institutions (see part 2.b, *infra*).

The televised board hearings had created quite a stir, and several more articles were published. The Enterprise reported that "[w]ord of the hearing spread soon after it opened at 6 P.M. Viewers said they called friends and family, alerting them to tune in" (August 25 article). On September 17, 2005, an article explored how municipalities in Massachusetts were struggling with computer policies and referenced the Savino and Howell incidents as recent examples (September 17 article). On September 19, 2005, the Enterprise published an article about how computer forensics technology was deployed to uncover the files stored on both Savino's and Howell's computers (September 19 article). Of Howell, the article reported that the technology "revealed Internet pornography had been accessed from the computer in his office."

The board reconvened as scheduled on September 21, 2005. After Jamieson completed his testimony, a motion was made to uphold the decision of the sewer commission. By a unanimous vote, the board upheld the three charges sustained by the sewer commission.

Although the record does not contain an article reporting on the board's final decision, the Enterprise did continue publishing articles that made reference to Howell. The Enterprise published an article on September 26, 2005, discussing a proposed conflict of interest rule (September 26 article). At the end of the article, the reporter wrote:

> "In unrelated action, a complaint of violating the state's conflict-of-interest law was filed against James Howell, who was fired last month from his post as sewer superintendent, according to a copy received by The Enterprise. The complaint alleges Howell purchased items for his personal use through the Sewer Department's vendors to take advantage of the town's discount and without payment of the appropriate sales tax. That was one of the charges brought against Howell by the Sewer Commission and upheld this week when selectmen denied his appeal."

The last half of the final sentence was incorrect; the conflict of interest charge was the sole charge not sustained by the sewer commission and was thus not upheld by the selectmen.

The Enterprise published its final article about Howell on November 29, 2005 (November 29 article). At the time, Howell was collecting unemployment benefits paid by the town even though he had been fired and continued to operate his private business. The town had contested the benefits but Howell had prevailed. The article reviewed the procedural history of Howell's request for unemployment compensation and mentioned that Howell had been denied a second hearing after the board upheld his termination. It went on to report that a complaint had been filed with the State Ethics Commission for violating the conflict of interest laws and that two female sewer department employees had filed claims with the town alleging sexual harassment as a result of Howell's conduct.

2. *Discussion.* a. *The fair report privilege.* We begin with a discussion of the fair report privilege that resolves much of this case. Massachusetts has long recognized a privilege for fair and accurate reports of official actions and statements. See, e.g., *ELM Med. Lab., Inc.* v. *RKO Gen., Inc.*, 403 Mass. 779, 782 (1989); *Jones* v. *Taibbi*, 400 Mass. 786, 794 (1987); *Cowley* v. *Pulsifer*, 137 Mass. 392, 393-394 (1884). The "fair report priv-

ilege" emerged as a safety valve to the common-law rule that a republisher of a defamatory statement was subject to the same liability as the original defamer. See *Medico* v. *Time, Inc.*, 643 F.2d 134, 137 (3d Cir.), cert. denied, 454 U.S. 836 (1981). See also 1 R.D. Sack, Defamation § 7.3.2.2.1, at 7-16 (3d ed. 2009). "The common law regime created special problems for the press. When a newspaper published a newsworthy account of one person's defamation of another, it was, by virtue of the republication rule, charged with publication of the underlying defamation." *Medico* v. *Time, Inc., supra.* Thus, the republication rule placed newspapers in difficult straits: even if the original statement was newsworthy because it was defamatory, the newspaper risked liability unless it could prove the truth of the defamation, often impossible by definition. The fair report privilege establishes a safe harbor for those who report on statements and actions so long as the statements or actions are official and so long as the report about them is fair and accurate.[8] See *id.* at 137-138.

Justice Holmes, writing for this court, had this to say concerning the policy behind the fair report privilege in the context of the reporting of court proceedings:

> "The accepted statement is that of Mr. Justice Lawrence in *Rex* v. *Wright*, 8 T.R. 293, 298: 'Though the publication of such [official] proceedings may be to the disadvantage of the particular individual concerned, yet it is of vast importance to the public that the proceedings of courts of justice should be universally known. The general advantage to the country in having these proceedings made public, more than counterbalances the inconveniences to the private persons whose conduct may be the subject of such proceedings.' . . . The chief advantage to the country which

---

[8]The privilege is not absolute. See *MiGi, Inc.* v. *Gannett Mass. Broadcasters, Inc.*, 25 Mass. App. Ct. 394, 397 (1988). See also *Yohe* v. *Nugent*, 321 F.3d 35, 44 (1st Cir. 2003). The privilege may "be vitiated by misconduct on the newspapers' part, but that misconduct must amount to more than negligent, or even knowing, republication of an inaccurate official statement. To defeat the privilege, a plaintiff must either show that the publisher does not give a fair and accurate report of the official statement [or action], or malice." *Id.* See 1 R.D. Sack, Defamation § 7.3.2.2.1, at 7-17 (3d ed. 2009) (describing privilege as qualified but generally stronger than other qualified privileges). Howell offers no evidence of malice; thus, our focus is on the reports' fairness and accuracy.

we can discern, and that which we understand to be intended by the foregoing passage, is the security which publicity gives for the proper administration of justice. It used to be said sometimes that the privilege was founded on the fact of the court being open to the public. . . . This, no doubt, is too narrow . . . ; but the privilege and the access of the public to the courts stand in reason upon common ground. . . . It is desirable that the trial of causes should take place under the public eye, not because the controversies of one citizen with another are of public concern, but because it is of the highest moment that those who administer justice should always act under the sense of public responsibility, and that every citizen should be able to satisfy himself with his own eyes as to the mode in which a public duty is performed." (Citations omitted.)

*Cowley* v. *Pulsifer, supra.* That is, society has struck a balance when official actions and statements are at issue. It has determined that its interest in subjecting official actions and statements to public scrutiny outweighs the defamatory harm that would otherwise be actionable.

We more recently explained the logic of the fair report privilege in *ELM Med. Lab., Inc.* v. *RKO Gen., Inc., supra* at 782: "The privilege recognizes that (1) the public has a right to know of official government actions that affect the public interest, (2) the only practical way many citizens can learn of these actions is through a report by the news media, and (3) the only way news outlets would be willing to make such a report is if they are free from liability, provided that their report was fair and accurate."

The Restatement (Second) of Torts § 611 (1977) codified the privilege as follows:

"The publication of defamatory matter concerning another in a report of an official action or proceeding or of a meeting open to the public that deals with a matter of public concern is privileged if the report is accurate and complete or a fair abridgment of the occurrence reported."

Courts and commentators identify three policies undergirding the fair report privilege, two of which are applicable to this case. See, e.g., *Medico* v. *Time, Inc., supra* at 140-142; 1 R.D. Sack, *supra* at § 7.3.2.2.2. The first policy, referred to as the

agency rationale, protects the press when it reports on official actions and statements that members of the public could have witnessed for themselves, that is, when it acts as the public's eyes and ears.

The second policy, or rationale, is one of public supervision. See *Medico* v. *Time, Inc., supra* at 141; 1 R.D. Sack, *supra* at § 7.3.2.2.2, at 7-20; *Ingenere* v. *American Broadcasting Cos.*, 11 Media L. Rep. (BNA) 1227, 1229 (D. Mass. 1984) ("By subjecting to exacting public scrutiny the machinations of government agencies the news media makes [*sic*] government officials accountable to the public in the performance of their duties"). With respect to this policy, we stated in *ELM Med. Lab., Inc.* v. *RKO Gen., Inc., supra* at 783, that the "fair report privilege is generally seen as allowing the news media to serve as a check on the power of government by giving the public the opportunity to be informed citizens and voters." Although the next sentence in the *ELM Med. Lab.* opinion speaks of the media as the public's "agents" and "eyes and ears," *id.*, we have never limited the privilege to the agency rationale. Serving as a check on the power of government frequently may require reporting on events outside the public eye or ear. See *Cowley* v. *Pulsifer*, 137 Mass. 392, 393-394 (1884) (discussing public interest in overseeing proper administration of justice); *Ingenere* v. *American Broadcasting Cos., supra*, quoting *Smith* v. *Daily Mail Publ. Co.*, 443 U.S. 97, 104 (1979) ("a free press cannot be made to rely solely upon the sufferance of government to supply it with information").[9]

Given these policy rationales, it is important that the privilege be construed liberally and with an eye toward disposing of cases at an early stage of litigation. See *New England Tractor-Trailer Training of Conn., Inc.* v. *Globe Newspaper Co.*, 395 Mass. 471, 480 (1985) (summary judgment is favored in defama-

---

[9]The third policy is premised on the general public interest in learning about important matters. Thus the privilege might be applicable to media reports of important but not official actions. 1 R.D. Sack, *supra* at § 7.3.2.2.2, at 7-21. But see *Kimball* v. *Post Publ. Co.*, 199 Mass. 248, 251 (1908) (declining to extend privilege to reports of stockholder meetings of private corporations). In *Medico* v. *Time, Inc.*, 643 F.2d 134, 142 (3d Cir.), cert. denied, 454 U.S. 836 (1981), the court called this rationale tautological. There is no need in the present case to extend the fair report privilege beyond its agency and public supervisory purposes.

tion cases). "Allowing a trial to take place in a meritless case 'would put an unjustified and serious damper on freedom of expression.' "[10] *Appleby* v. *Daily Hampshire Gazette*, 395 Mass. 32, 37 (1985), quoting *National Ass'n of Gov't Employees, Inc.* v. *Central Broadcasting Corp.*, 379 Mass. 220, 233 (1979), cert. denied, 446 U.S. 935 (1980). That is, the purpose of the privilege is not served completely by freeing republishers from liability alone; the threat from extended litigation itself deserves its own response. Summary judgment is designed for this purpose, provided the privilege applies. See *Appleby* v. *Daily Hampshire Gazette, supra*; *King* v. *Globe Newspaper Co.*, 400 Mass. 705, 708 (1987).

In this case, the Enterprise published details of nonpublic actions by the sewer commission based in part on the statements of anonymous sources. Some of the accounts arguably strayed from their factual underpinnings by embellishing the charges against Howell with shorthand terms or with the negative gloss offered by the sources. We begin by determining whether the Enterprise reported on "official" actions or statements within the scope of the privilege. We then scrutinize the Enterprise's reporting to determine if it was fair and accurate.

(i) *Official actions and statements.* Our cases have taken an expansive but not unlimited view of what qualifies as an "official" action. To define official action we return to Justice Holmes's original articulation of the privilege in the context of the judicial branch: it applies when justice is "administer[ed]." *Cowley* v. *Pulsifer, supra* at 394. Extrapolating this notion to the other branches and institutions of government, we properly focus on their administration of public duties, and the exercise of the power of government to cause events to occur or to impact the status of rights or resources. See *Jones* v. *Taibbi*, 400 Mass. 786, 794 (1987) ("There is a well established privilege to publish reports of judicial, legislative, or other official proceedings");

---

[10]Although we have not had occasion to determine if the fair report privilege is compelled by the United States Constitution or the Massachusetts Constitution, there is little doubt that the privilege insulates a category of speech that tends to receive the utmost deference from both. See *Cowley* v. *Pulsifer*, 137 Mass. 392, 393-394 (1884). See also *Medico* v. *Time, Inc., supra* at 143-145, discussing *Cox Broadcasting* v. *Cohn*, 420 U.S. 469 (1975), and *Time, Inc.* v. *Pape*, 401 U.S. 279 (1971).

*Sibley* v. *Holyoke Transcript-Telegram Publ. Co.*, 391 Mass. 468, 471 (1984) (in judicial context, privilege applies where "judicial powers are exercised").[11] The United States Court of Appeals for the Ninth Circuit formulated a useful approach to what constitutes an official act or proceeding in *Crane* v. *Arizona Republic*, 972 F.2d 1511, 1518 (9th Cir. 1992). Interpreting California's statute codifying the privilege, the court wrote:

> "[P]olicy concerns . . . counsel against straitjacketing the privilege with a narrow interpretation of the terms 'legislative' or 'public official' proceeding. Citizens cannot monitor their government when it conducts business behind closed doors. . . . [T]he phrase, 'public' would appear to mean 'governmental' as opposed to private actions. 'Official' apparently signifies formal, as opposed to informal, governmental proceedings."

*Id.*[12] Although statutory interpretation is not a task we must

---

[11]Our cases require something more than the mere filing of a defamatory complaint by a private citizen with a governmental body to qualify a report thereon for the protection of the privilege. We have explained this limitation as a safeguard against enabling individuals to cloak their defamation in immunity merely by filing a complaint. For example, in *Lundin* v. *Post Publ. Co.*, 217 Mass. 213, 217 (1914), this court held that the filing of a civil claim in court was insufficient to make a report of its allegations come within the privilege because there had been "no examination of the averments of her declaration in that action, no passing upon their sufficiency, no consideration of the question whether she was entitled to any special relief." However, once the court has taken some substantive action in the case, the privilege takes hold. For example, in *Sibley* v. *Holyoke Transcript-Telegram Publ. Co.*, 391 Mass. 468, 468-469 (1984), we held that the privilege was available when a newspaper published statements (which a jury subsequently found to be false) contained in an affidavit presented to a judge in order to obtain a search warrant because the judge had evaluated the sufficiency of the affidavit before issuing the warrant. Similarly, we have held that fair and accurate accounts of an investigation and report by a grand jury are covered by the privilege because the actions of the grand jury constitute a judicial proceeding, *Sweet* v. *Post Publ. Co.*, 215 Mass. 450, 452 (1913), and that the privilege is not limited to proceedings before a judge; rather, it extends to instances where the judicial powers are exercised. See *Thompson* v. *Boston Publ. Co.*, 285 Mass. 344, 346-347 (1934) (report of allegations on which plaintiff was arrested after warrant was issued by clerk of court is privileged).

[12]California codified the fair report privilege in Cal. Civ. Code § 47(d)(1) (West 2007), which provides:

> "A privileged publication or broadcast is one made . . . [b]y a fair

undertake in this case, we agree with the basic construct that a newspaper is on solid ground when it reports on formal (as opposed to informal), governmental (as opposed to private) proceedings and actions.

A textbook form of an official action or proceeding is a public hearing before a judge or the Legislature or some other governmental body. However, consistent with our indorsement of the public supervision rationale, the privilege also covers proceedings and actions taken out of the public view so long as they are official.[13]

Because reports of nonpublic or closed-door official actions

and true report in . . . a public journal, of (A) a judicial, (B) legislative, or (C) other public official proceeding, or (D) of anything said in the course thereof, or (E) of a verified charge or complaint made by any person to a public official, upon which complaint a warrant has been issued."

See *Crane* v. *Arizona Republic*, 972 F.2d 1511, 1517 (9th Cir. 1992). While not identical to the privilege articulated in the Restatement (Second) of Torts § 611 (1977), and while the privilege in Massachusetts is based on the common law, nothing indicates that California recognizes a privilege that is different in substance from ours.

[13]A leading commentator bolsters this conclusion:

"There is substantial but not unanimous support for the proposition that even where proceedings reported are official but not public, and the press is not therefore acting as a 'public eye,' the privilege may nevertheless attach. The proposition is consistent with the theory that the privilege is meant to protect oversight of the performance of public officials and to encourage communication about matters of public interest."

1 R.D. Sack, *supra* at § 7.3.2.2.4, at 7-30 to 7-31.

We recognize that G. L. c. 39, § 23B, permits certain municipal meetings and proceedings to be held in executive session, including those concerning the discipline of a public employee.

It is Justice Spina's position, *post* at 675, that this statutory framework supersedes the common-law fair report privilege because a participant in an executive session could circumvent the legislative policy behind permitting certain proceedings to be held in secret simply by disclosing to the press what occurred in the session. We do not think the Legislature intended to circumscribe the fair report privilege when it enacted G. L. c. 39, § 23B: it did not include any provision limiting the disclosure rights of individuals present in executive sessions, nor any provision exacting any remedy, civil or criminal, for disclosure. The public supervision rationale is grounded in the sanctity of the reporting that it protects. See note 10, *supra*. Until the Legislature indicates with specificity its intent to limit the protection our laws have traditionally afforded the

are often disclosed by anonymous rather than official sources, it can be difficult to gauge whether the privilege should attach. See, e.g., *Bufalino* v. *Associated Press*, 692 F.2d 266, 271-272 (2d Cir. 1982), cert. denied, 462 U.S. 1111 (1983); *Lewis* v. *Newschannel 5 Network, L.P.*, 238 S.W.3d 270, 287 (Tenn. Ct. App. 2007). In this respect, it is important to distinguish reports of official statements from reports of official actions, both of which are covered by the fair report privilege. See *Jones* v. *Taibbi*, 400 Mass. 786, 797 (1987) (defamatory statements at official press conference would be privileged); *Medico* v. *Time, Inc.*, 643 F.2d 134, 141-142 (3d Cir.), cert. denied, 454 U.S. 836 (1981) (allegations in nonpublic, official investigatory documents qualified for privilege).

Reports of official statements are covered by the privilege so long as the reports fairly and accurately describe the statements,

press in its reporting of official action, we are disinclined to interpret G. L. c. 39, § 23B, in a manner that would.

Justice Spina quotes *Bufalino* v. *Associated Press*, 692 F.2d 266, 272 (2d Cir. 1982), cert. denied, 462 U.S. 1111 (1983) (discussing Pennsylvania law), for the proposition that "[o]nly reports of *official* statements or records made or released by a public agency are protected by the § 611 privilege" (codified at Restatement [Second] of Torts [1977]) (emphasis in original). *Post* at 675. However, that case is not implicated where a reporter relies on a third party to relay the contents of official proceedings to which the reporter was not privy. See *Bufalino* v. *Associated Press, supra* at 271 (acknowledging *Binder* v. *Triangle Publs., Inc.*, 442 Pa. 319 [1971], for holding that "the privilege is available where a reporter who purports to report on an official proceeding does not have personal knowledge of the proceeding but instead relies on an intermediary who does"). Rather, the court in the *Bufalino* case held the privilege was unavailable because of the specific circumstances of that case: the reporter repeated defamatory statements by anonymous officials that the court could not confirm were based on any official proceeding or document. *Id.* Therefore, the court was required to assume that the reporter obtained his information from lower-level officials who based their statements on nothing other than a hunch. This is distinct from cases where the reporter relies on third parties who have accurately relayed information contained in official documents or presented in official proceedings. See *id.* at 272.

Finally, Justice Spina concludes by stating that testimony given in an executive session is not an official action. *Post* at 674-675. This is incorrect. By taking the stand, witness statements become part of a formal governmental proceeding; they are therefore official. Fair and accurate reports of those statements are thus privileged. See Restatement (Second) of Torts § 611 comment d (1977) ("Since the holding of any official hearing or meeting is in itself an official proceeding, the privilege includes the report of any official hearing or meeting, even though no other action is taken"). *Id.* at 272.

even though the statements themselves may contain defamatory material, or inaccurately report on official actions in a defamatory way. But an anonymous statement is not an official one. The privilege to report official actions would mean very little, however, if to qualify for its protection, the media were limited to reporting such actions solely on the basis of on-the-record statements by high-ranking (authorized to speak) officials or published official documents. Consequently, the privilege extends to reports of official actions based on information provided by nonofficial third-party sources.[14] See 1 R.D. Sack, Defamation § 7.3.2.2.7, at 7-38 to 7-39 (3d ed. 2009).[15] It should be of no moment that a reporter's source is, in fact, a high official, a low

---

[14]Our decision in *Jones* v. *Taibbi*, 400 Mass. 786 (1987), is not to the contrary. That case arose when a reporter broadcast numerous reports about the plaintiff's arrest on suspicion of committing several murders in California. The reporter had an early break on the story because he had received a tip from a Massachusetts prisoner. The first report was broadcast immediately following the plaintiff's arrest and included a "background report" with a description of the prisoner's allegations, information about how the police believed the prisoner because he had passed several polygraph tests, and interviews with members of the prisoner's family who expressed faith in his truthfulness. *Id.* at 789-790. Thus, what was conveyed by the reporter's coverage was more than an account of official action; his were reports about the prisoner's allegations and the degree to which the police and others could rely on them.

We held that only certain aspects of the reports were privileged. *Id.* at 794-796. Without question, reporting the plaintiff's arrest and showing film of the event were privileged as official action. *Id.* at 795. However, we concluded that the privilege could not attach to "unofficial statements." *Id.* at 796. The statements made by the prisoner's family members as to his truthfulness failed under this standard. In contrast, it was unclear on the record whether the Los Angeles police department had made "the substance" of the prisoner's allegations public as part of an official statement. *Id.* at 797. We suggested that republishing the allegations of the prisoner would not be privileged if not first memorialized in some sort of official statement, report, or publication. *Id.* at 802.

Like our cases requiring something more than the filing of a civil complaint, see note 11, *supra*, the *Jones* case stands for the principle that mere allegations made to public officials cannot support the privilege; something must imbue the allegations with an official character. See *id.* at 796-797; *Reilly* v. *Associated Press*, 59 Mass. App. Ct. 764, 776-777 (2003) ("unconfirmed hearsay, upon which no police action was taken, has neither the authority nor the importance to the public that other documents or statements shielded by the fair reporting privilege possess").

[15]Not all jurisdictions have adopted this rationale. See, e.g., *Bufalino* v. *Associated Press*, 692 F.2d 266, 271-272 (2d Cir. 1982), cert. denied, 462 U.S. 1111 (1983); *Lewis* v. *Newschannel 5 Network, L.P.*, 238 S.W.3d 270, 284 (Tenn. Ct. App. 2007); solely on the agency rationale, the Court of Appeals of

official, or a mere witness who overheard the proceedings, so long as it is official action that is reported. If, however, the source is an unofficial or anonymous one, a report based on that source runs a risk that the underlying official action will not be accurately and fairly described by the source, and therefore will not be protected by the privilege, or that the information provided will go beyond the bounds of the official action and into unprivileged territory.[16]

With the foregoing cases and principles in mind, we conclude that the articles appearing in the Enterprise reported on official actions, proceedings, and statements.[17] The May 11 article reported that Howell had been placed on administrative leave. This was official action.[18] When the Enterprise published articles

---

Tennessee did not consider privileged a report that augmented information contained in a press release with details that did not come from the release. *Id.* at 286. The defendant broadcaster "obtained these details from anonymous informants, a private conversation with [a police officer], and recordings of official radio transmissions and telephone calls that had not been released to the public." *Id.* The court said the report "did more than broadcast to the members of the public what they would have read or heard had they been provided with a copy of the Chief of Police's press release"; therefore, the case ran afoul of the "core" of the privilege, official actions. *Id.* at 287. With regard to the anonymous sources, the court said the "statements do not reflect official agency action . . . and do not have sufficient 'authoritative weight' to be considered an official public proceeding" (citation omitted). *Id.,* quoting *Phillips* v. *Evening Star Newspaper Co.,* 424 A.2d 78, 89 (D.C. 1980). See *Bufalino* v. *Associated Press, supra* at 272 (anonymous sources masked by reporter "shield law" could not be "official" because court could not confirm they were not statements of "lower-level employees that [did] not reflect official agency action"). The court in *Lewis* v. *Newschannel 5 Network, L.P., supra* at 286, called this the "prevailing view" and cited cases and authorities, but a survey of case law from Massachusetts and jurisdictions around the country does not support so limited a view.

[16]When analyzing a statement attributed to an anonymous source, it may be useful to consider the statement in an unattributed form. That is, if the statement describes an official action or proceeding then it should not matter whether it is attributed to no one at all. Thus, if the unattributed statement reflects official action, the source of the statement is unimportant.

Where anonymity seems most relevant is in our next inquiry, which probes the fairness and accuracy of the Enterprise's reports. As with the children's game of "telephone," the more attenuated the source is from the official action, the greater the reporter's risk that his or her account will not be fair or accurate.

[17]We deal with the article by Steve Damish, the newspaper's "metro editor" (Damish article) separately, see part 2.b, *infra.*

[18]The original conversation between Jamieson and Warren about the images

on the sewer commission hearing (July 20 article), Howell's termination after a sewer commission vote (August 3 article), and the board hearing (August 24 article, August 25 article, September 17 article, September 19 article), it reported on official actions and proceedings. The statements and actions reported plainly implicated official duties and powers, either in the context of the official hearings or in the exercise of official powers as a result of the evidence adduced at those hearings. The Enterprise's reliance on anonymous sources did not destroy the privilege because the sources described official action. Similarly, that some of the actions were not public is not problematic: the actions were "governmental" and "formal." See *Crane* v. *Arizona Republic*, 972 F.2d 1511, 1518 (9th Cir. 1992).

Howell argues that the September 26 article was factually inaccurate because it stated that the sewer commission had sustained its conflict of interest charge and that the board had upheld its decision. That, however, is an issue of the report's fairness and accuracy, which we take up below. The board's decision was an official action.

Finally, the November 29 article reported that the town had contested Howell's unemployment benefits but that Howell had prevailed. Howell argues that the decision over an individual's unemployment benefits is not newsworthy, but newsworthiness is not relevant. An official decision was rendered by the Department of Employment and Training, the report of which is privileged if fair and accurate. Moreover, the information about the decision came from an interview with Warren, the town manager. When an official of sufficient authority to speak memorializes alleged defamation in an official statement, a republication of that official statement is privileged so long as the report of it is fair and accurate. See *Jones* v. *Taibbi*, 400 Mass. 786, 797 (1987). Granted, the Enterprise did not attribute

found stored on Howell's computer was not an official action or proceeding. Nor, given its privacy, were their words official statements. Indeed, Warren had no jurisdiction over Howell's employment status; his involvement was purely advisory. Although Jamieson, as chairman of the sewer commission, did have authority to take action, his discussion with Warren did not implicate that power. It was not until Jamieson actually placed Howell on administrative leave that official action was involved. Prior to that, the conversation was informal, not formal, although it was governmental, not private. Nevertheless, the act of placing Howell on administrative leave was an official one.

every statement in the November 29 article to Warren, sometimes referring only to "[o]fficials" even though the reporter's notes reveal that Warren was probably the sole source for those facts. The question is whether "an average reader would be unlikely to understand the article (or pertinent section thereof) to be a report on or summary of an official [statement]." *Dameron* v. *Washington Magazine, Inc.*, 779 F.2d 736, 739 (D.C. Cir. 1985), cert. denied, 476 U.S. 1141 (1986). An average reader of the portion of the November 29 article that addressed Howell's collection of unemployment compensation would understand it to be a summary of an official statement because the Enterprise was clearly paraphrasing official statements instead of continuing to quote them directly. Cf. *id.* at 740 (report would not be understood as summary of official statement because article gave impression that statements were conclusions of article's author).[19]

(ii) *Fairness and accuracy.* Whether a report was fair and accurate is a matter of law to be determined by a judge unless there is a basis for divergent views. *Joyce* v. *Globe Newspaper Co.*, 355 Mass. 492, 498-499 (1969). Given the generosity of the standard, however, usually it will be appropriate for the judge to decide whether the privilege attaches in a particular case. This accords with the general policy of conferring the privilege in the first place: ensuring certain conduct is not deterred out of concern of being haled before a jury. See *ELM Med. Lab., Inc.* v. *RKO Gen., Inc.*, 403 Mass. 779, 786 (1989), citing *King* v. *Globe Newspaper Co.*, 400 Mass. 705, 708 (1987), cert. denied, 485 U.S. 940 and 485 U.S. 962 (1988).

The Restatement (Second) of Torts § 611 comment f (1977) sets forth accuracy and fairness as two separate inquiries. A report is accurate if it "conveys to the persons who read it a substantially correct account of the proceedings." It is fair so long as it is not "edited and deleted as to misrepresent the proceeding

---

[19]At the end of its September 26 article, and again in its November 29 article, the Enterprise noted that a complaint had been filed against Howell with the State Ethics Commission for violating conflict of interest laws. The November 29 article also reported that two female sewer department employees had filed claims alleging sexual harassment as a result of Howell's conduct. These statements would not be protected by the fair report privilege because the privilege does not protect reports based on complaints alone. See note 11, *supra.* Howell has not alleged, however, that these statements were defamatory.

and thus be misleading." While a report need not be exhaustive, a reporter is not free to omit or misplace facts or make additions that "convey an erroneous impression to those who hear or read it."

Courts tend to evaluate reports without clearly delineating the accuracy and fairness prongs of the inquiry. See *Jones* v. *Taibbi*, *supra* at 795-796; *Binder* v. *Triangle Publs., Inc.*, 442 Pa. 319, 326-327 (1971). This is an understandable approach because the Restatement's standard for both prongs implicates what message is conveyed to the recipient of the report. That is, the accuracy question is whether the reports are sufficiently factually correct such that a reader would not get an erroneous impression of what actually happened. The fairness question is whether the reporter's editorial decisions — such as characterizations, juxtapositions, and choice of focus — would give a reader an erroneous impression about the character of what happened. Overall, courts appear to have synthesized this analysis into a single judgment call. For example, in *Jones* v. *Taibbi*, *supra*, we said the privilege was not lost when a broadcast reported the plaintiff had been charged with murder when, in fact, he had been only arrested on suspicion of it. We did not break our analysis into two parts, but wrote that "the report did not become substantially inaccurate [because] the impact of [the] statement did not create a substantially greater defamatory sting than an accurate report [would have]." *Id.*

Similarly, in *ELM Med. Lab., Inc.* v. *RKO Gen., Inc.*, *supra* at 783, we articulated the fair and accurate standard in the following terms:

> "[A] report need give only 'a rough-and-ready summary that was substantially correct' in order to qualify for the fair report privilege. [*MiGi, Inc.* v. *Gannett Mass. Broadcasters, Inc.*, 25 Mass. App. Ct. 394, 396 (1988).] A statement is considered a fair report 'if its "gist" or "sting" is true, that is, if it produces the same effect on the mind of the recipient which the precise truth would have produced.' *Williams* v. *WCAU-TV*, 555 F. Supp. 198, 202 (E.D. Pa. 1983)."

We then proceeded to describe the report's technical and numerical mistakes as privileged because the report was a "fair one."

*ELM Med. Lab., Inc.* v. *RKO Gen., Inc.*, *supra* at 784. Under the bifurcated approach of the Restatement, we clearly meant "fairly accurate." See Restatement (Second) of Torts, *supra* at § 611 comment f. In *Lewis* v. *Vallis*, 356 Mass. 662, 666 (1970), we blended the inquiries in the other direction, using accuracy as the umbrella label: "Accuracy in this respect means substantially accurate and not distorted and need not be correct in every particular."[20]

Nevertheless, there is some risk in completely blending the fairness and accuracy prongs. The Restatement puts us on alert for two sorts of reporting errors: mistakes in reporting what actually happened (accurate), and liberties taken in reporting the character of what actually happened (fair). We examine both through the lens of the reasonable recipient of the report to gauge the substantiality of the report's accuracy and fairness. This is, for lack of a better formulation, best described as a fairness overlay to the fair and accurate inquiries: is the report sufficiently factually incorrect or sufficiently mischaracterized that the impression on the reader is so unfair to the plaintiff as to warrant placing it outside the privilege? We note this because our task in the present case involves a combination of errors of "accuracy" and "fairness."

It makes sense to begin with a threshold inquiry into the Enterprise's accuracy. That is, were any of its reports glaring in their inaccuracy?[21] An examination of the record in this case leaves little doubt that most of the articles by the Enterprise reported on official actions that did, in fact, happen: Howell was placed on administrative leave, he defended himself but

---

[20]A judge in the United States District Court for the District of Massachusetts has described the fair and accuracy inquiry this way: "[C]ourts hearing defamation claims are to apply a common sense standard of expected lay interpretation of media reports of trials, rather than inquiring whether a report was strictly correct in defining legal charges and describing legal rulings." *Ricci* v. *Venture Magazine, Inc.*, 574 F. Supp. 1563, 1567 (D. Mass. 1983).

[21]In *ELM Med. Lab., Inc.* v. *RKO Gen., Inc.*, 403 Mass. 779, 784 (1989), we compared what was reported by the defendant to what was contained in the public health alert. We held that the newspaper was substantially accurate when it estimated or extrapolated percentages from numbers supplied by the public agencies. None of the estimates was mathematically correct, but most were close enough to meet the substantially correct standard; they "substantially reflect[ed] the content of the governmental report." *Id.* However, the final report was not accurate enough because it reported what amounted to a greater than one hundred per cent error rate by the plaintiff. *Id.*

lost before the sewer commission, and he lost his appeal before the board of selectmen. He did, in fact, collect unemployment after the town contested it. Only one article gives us pause based on a threshold review of its accuracy. Specifically, the September 26 article included the following statement:

> "The [conflict of interest] complaint [filed with the State Ethics Commission] alleges Howell purchased items for his personal use through the Sewer Department's vendors to take advantage of the town's discount and without payment of the appropriate sales tax. That was one of the charges brought against Howell by the Sewer Commission and upheld this week when selectmen denied his appeal."

The final sentence is not correct: Howell was accused of violating conflict of interest laws by the sewer commission, but the sewer commission did not sustain that charge. Thus, there was nothing for the board to uphold. This was not akin to the mistake in the case of *Jones* v. *Taibbi, supra* at 795-796, where the broadcast reported the plaintiff had been charged with murder when in fact he had only been booked on suspicion of murder. We held that that error did not cause greater defamatory sting than the truth. Rather, the September 26 article is patently wrong in the same way the final report in the *ELM Med. Lab.* case was. The distance between an acquittal and a conviction is too great to meet the substantial accuracy test. That aspect of the September 26 article, then, is not protected by the fair report privilege.

Our inquiry does not end there, although we are required to detour briefly into another area of defamation law. See *ELM Med. Lab., Inc.* v. *RKO Gen., Inc., supra* at 786. Liability for defamation is determined by the status of the person defamed: if that person is a public figure, he must prove the defendant acted with malice, i.e., reckless disregard for the truth. See *id.* at 785-787. As a town official who was the subject of an investigation implicating his official duties, Howell qualifies as a public figure. To survive summary judgment, Howell was therefore required to offer evidence from which a finder of fact could infer malice by the reporters. *Id.* He has not. Thus, although not protected by the fair report privilege, the incorrect statements in the September 26 article were not made with the requisite mental state required to subject its author to liability.

We return to the fair report privilege to evaluate the rest of the Enterprise's reporting under the substantial accuracy and fairness standard. Closer scrutiny is required because the Enterprise characterized the charges against Howell in less than accurate ways, quoted an exaggerated description of the files on his computers, and juxtaposed its reporting with accounts of the more salacious proceedings against a different official from a different town. We take each article in turn, although we address the repeated juxtaposition of the Savino incident in East Bridgewater separately.

The May 11 article reported that Howell had been placed on administrative leave "amid allegations that pornography and records from a business he owns were found on Sewer Department computers." The headline, "Officials find porn on town computer," did not include the "allegations" qualifier. It also reported that an anonymous official "alluded to a possible criminal investigation by Abington police." The Restatement does state that "use of a defamatory headline in a newspaper report, qualification of which is found only in the text of the article," can render the report unfair. Restatement (Second) of Torts § 611 comment f (1977). However, we note that the headline of the May 11 article made no reference to Howell, and thus any negative impact on Howell would come only after reaching the text. In that light, the term "porn" in the headline should be evaluated in conjunction with the statement regarding "allegations that pornography . . . [was] found." The Enterprise was neither substantially inaccurate nor unfair in its description. At that point, there was no document formally describing the images stored on Howell's computers, but the chairman of the sewer commission had put Howell on administrative leave because he found the images inappropriate and pornographic. Eventually, the images were described in the formal disciplinary charges as "photographs and cartoon-style pictures of a pornographic nature." Whether the images were pornographic or not, it was not substantially inaccurate or unfair to report that the official accusation leveled against Howell was that the images were "pornographic."[22] The line between images "of a

[22]The images were variously juvenile, silly, misogynistic, and crude attempts at humor — none of which is to say that they were appropriate for the workplace. However, the images were routinely described as "pornographic in

pornographic nature," "pornography," and the shorthand "porn" is not so clear as to render the Enterprise's characterization unfair. That a source "alluded to a possible criminal investigation" was not unfair or substantially inaccurate because the police had, in fact, seized the computers and did view their contents for illegality. Moreover, we treat reports of official investigations as statements of fact, not republications of the underlying allegations. See *Sibley* v. *Holyoke Transcript-Telegram Publ. Co.*, 391 Mass. 468, 471-472 (1984). See also 1 R.D. Sack, Defamation § 7.3.2.2, at 7-41 (3d ed. 2009) (characterizing *Sibley* case). The May 11 article was privileged in its entirety.

The July 20 article is nearly bereft of inaccurate statements because its focus is on the reticence of the participants of the sewer commission hearing. The article reported some basic facts about the purpose of the hearing, its duration, and the atmosphere outside the hearing's closed doors, but those statements were accurate and included no editorial choices that might be construed as unfair. The Enterprise did characterize the hearing as a "porn hearing" in its headline and repeated the "allegations" against Howell. Once again, we cannot find this description to be unfair or substantially inaccurate. The article was privileged.

On August 3, the Enterprise reported the official vote to terminate Howell. Most of the information in the article was attributed to an anonymous member of the sewer commission. We have already established that the anonymity of a reporter's source is not a per se bar against the fair report privilege so long as the subject matter is an official action or proceeding. Here, the record shows that the anonymous official gave a near perfect account of the testimony offered at the sewer commis-

nature" by officials and by witnesses. It is that official description that concerns the fair report privilege.

The Appeals Court focused on the content of the images instead of the content of the official allegations. *Howell* v. *Enterprise Publ. Co.*, 72 Mass. App. Ct. 739, 743 (2008). That is not the nature of the inquiry. "[T]he assertion that the report is privileged as being 'fair and accurate' differs sharply from the assertion that it is privileged because it is true. For example, a journalist may report testimony offered in court that injures another without determining whether testimony is in fact true. The decisive issue is whether the journalist's report of testimony was fair and accurate." *Ricci* v. *Venture Magazine, Inc.*, 574 F. Supp. 1563, 1567 (D. Mass. 1983).

sion's proceedings.[23] While the Enterprise took a risk relying on a third-party account for its information, its report turned out to be substantially accurate. That aspect of the report was more than a "rough-and-ready summary" of the proceedings and was therefore privileged. See *ELM Med. Lab., Inc.* v. *RKO Gen., Inc.*, 403 Mass. 779, 783 (1989).

However, the article also included a quote from the anonymous commissioner that added color to the description of the closed door proceedings.[24] When the official described the images included in the slide show displayed to the commissioners as "images you wouldn't want your children to see," he was discussing evidence presented at an official proceeding — the hearing — but he also was adding his own gloss to the event. This is distinct from how the Enterprise changed images "of a pornographic nature" into "pornography," and "pornography" into "porn," because the official was clearly conveying an opinion separate from the official proceeding. However, in context, the additional characterization did not convey a substantially greater defamatory sting than the testimony and images entered in evidence at the hearing. See *ELM Med. Lab., Inc.* v. *RKO Gen., Inc., supra* at 783-784; *Jones* v. *Taibbi*, 400 Mass. 786, 795-796 (1987).

The August 5 article discussed the procedure by which Howell could appeal from the sewer commission's decision to terminate him. Like the August 3 article, the August 5 article accurately and fairly reported on the content of the hearing.

The next article was published in the wake of the public board hearing. The August 24 article did not stray from an account of what was actually said in public testimony. It accurately listed the charges against Howell: it reported he was "charged . . . with . . . [d]ownloading pornography from the Internet

---

[23]For example, the source disclosed that Howell's computer stored approximately 150 explicit images. The testimony at the proceeding was that one hundred to 150 images were stored on the computer.

[24]" 'These were images you wouldn't want your children to see,' the commission member said. Commission members would not say who came forward with the allegations against Howell. 'The point is, it happened. The board, acting on behalf of the town, was forced into action and would have been negligent if it had not acted. The potential is still very real for a sexual harassment lawsuit,' the commission member said. The source added that Howell 'thinks he did nothing wrong.' "

and sending unsolicited e-mail with inappropriate material to a woman who worked for him," which accurately paraphrased the charge read into the record. The article also described the images shown at the public hearing and quoted parts of the live testimony by Cathcart and O'Sullivan. The Enterprise met its burden of being fair and accurate, and the article was privileged.

The Enterprise published articles on August 25, September 17, and September 19 that included mentions of Howell's case, and because they touch on official proceedings, we have established that these articles can qualify for the privilege. However, the articles are not principally "about" the official proceedings; most of the coverage in those articles was dedicated to reports of ancillary matters, including the community's reaction to the hearings (August 25 article), how municipalities were struggling to establish effective computer policies in light of cases like Howell's (September 17 article), and computer forensics technology (September 19 article). Such matters are generally not covered by the privilege because they are not official proceedings or actions. But the question is whether, by adding such ancillary reporting to otherwise privileged reports of official proceedings, the articles became unfair. We hold that they did not.[25] The August 25 article did not change the "gist or sting" of its account of the board hearing by virtue of reporting that the town's residents had mixed reactions to the televised hearing. See *ELM Med. Lab., Inc.* v. *RKO Gen., Inc., supra* at 783. Similarly, the Enterprise did not render its account of the town's official action misleading by placing it within a story about the challenge of formulating effective computer policies or about computer forensics.

---

[25]Howell contends that these articles hold him out as a cautionary example of official misconduct. But this confuses the inquiry: it is not whether the ancillary matters are given defamatory meaning by their proximity to accurate accounts of official proceedings but, rather, whether the otherwise accurate accounts of official proceedings are rendered unfair by their proximity to the ancillary matters. Restatement (Second) of Torts § 611 comment f (1977). This is so because Howell cannot argue that a report on computer forensics is defamatory to him; his focus is properly on the statements that concern his case. So long as a reader could tell that the Enterprise drew its reporting from the official proceeding, the privilege remained available. See *Dameron* v. *Washington Magazine, Inc.*, 779 F.2d 736, 739 (D.C. Cir. 1985), cert. denied, 476 U.S. 1141 (1986).

Finally, the November 29 article about the proceedings lead-
ing to Howell's award of unemployment benefits was fair and
accurate. Howell does not contend that the article is inaccurate
in its report of Howell's victory regarding those benefits. Rather,
he argues that the Enterprise made editorial decisions that make
the article unfair by implying that he lied about his awareness
of the town's computer policy. This puts the cart before the
horse: the defamatory nature of the alleged insinuations is rele-
vant only after finding that the Enterprise did *not* give a fair or
accurate report of those insinuations. The privilege is designed
to protect official statements that are newsworthy in part because
they are defamatory. *Medico* v. *Time, Inc.*, 643 F.2d 134, 137
(3d Cir.), cert. denied, 454 U.S. 836 (1981). Because Howell
does not contend that the report unfairly summarized the offi-
cial statements of the town manager, we are left with the conclu-
sion that it did not.

We have concluded that all of the articles, save one sentence in
the September 26 article, were fair and accurate reports of official
actions and statements. This analysis is not altered by the fact
that several of the articles made reference to the separate Savino
affair.[26] Of the six articles that discuss Savino and Howell, the
first four clearly delineated the two cases. The final two articles
discussed Howell and Savino in a more comparative fashion, but
the Enterprise never blurred them. No reasonable reader could
have concluded that the Enterprise was commenting on Howell
when it reported on Savino. Thus, the references to Savino can-
not meet the threshold requirement that a statement be capable of
defamatory meaning. See *Foley* v. *Lowell Sun Publ. Co.*, 404
Mass. 9, 11 (1989). Accordingly, the juxtaposition could not
qualify as a reporter addition that would convey a defamatory
impression rendering the Enterprise's report of official action
unfair. See Restatement (Second) of Torts § 611 comment f
(1977).

Our common law considers fair and accurate reports of offi-
cial actions to be privileged because we value the light the press
shines on those charged with stewarding the public trust. See
*Cowley* v. *Pulsifer*, 137 Mass. 392, 393-394 (1884). The nature

[26]The May 11, August 3, August 5, August 24, September 17, and September
19 articles referenced Savino. The Damish article also discussed the Savino
issue; however, we take up that article separately. See part 2.b, *infra*.

of the privilege is such that we cannot pick and choose when to engage its protections; either it must apply all the time or it will never apply at all. Here, Howell believes the official proceedings at issue were part of a personal vendetta against him. In support of this, Howell points to the incongruity between the nature of the images stored on his computer and the heavy punishment of termination. However, this is a complaint to be lodged against his accusers, not the press. Indeed, the privilege exists in part to help individuals like Howell alert fellow citizens to potential injustices.

b. *The Damish article.* "Statements alleged to be libelous must be interpreted reasonably," *King* v. *Globe Newspaper Co.*, 400 Mass. 705, 711-712 (1987), cert. denied, 485 U.S. 940 and 485 U.S. 962 (1988), to determine the "threshold issue . . . whether [the statement is] 'reasonably susceptible of a defamatory connotation.' " *Jones* v. *Taibbi*, 400 Mass. 786, 791-792 (1987), quoting *Cianci* v. *New Times Publ. Co.*, 639 F.2d 54, 60 (2d Cir. 1980). "A statement is defamatory in the circumstances if it discredits a person in the minds of any considerable and respectable class of the community. . . . If, however, the uncontroverted facts show that the allegedly libelous statements were true, [summary] judgment for the defendant is warranted." (Citations omitted.) *Milgroom* v. *News Group Boston, Inc.*, 412 Mass. 9, 12 (1992). The Damish article included statements that may fairly be called statements of fact. See *Aldoupolis* v. *Globe Newspaper Co.*, 398 Mass. 731, 733 (1986) ("whether a statement is a factual assertion or an opinion is a question of law if the statement unambiguously constitutes either fact or opinion"). Damish described the images displayed at both the Howell and Savino hearings in some detail. For example, Damish wrote:

> "Now [officials] have to stare at topless Miss Piggy, or women and men having sex, or a naked toddler grabbing her genitals, or a man lifting a barbell with his private parts, or a person with a cigarette in his behind. Howell and Savino had hundreds of these images on their computers. For purposes of clarification, it should be stated that Savino had the worst stuff — he had the images of people engaged in sexual acts."

The summary judgment record conclusively establishes that the

uncontroverted facts show that the allegedly libelous statements were true: Howell's hearing, which was publicly televised, included all the pictures listed in Damish's account — all, that is, except for images of men and women having sex, which Damish explicitly attributed to Savino.[27] Thus, rather than overtly equating Howell with Savino, as the Superior Court judge concluded, the Enterprise attributed to Howell only those images that were demonstrably his. Indeed, the Enterprise asserted that "Savino had the worst stuff."

The remaining portions of the Damish article are protected statements of opinion based on disclosed nondefamatory facts. See *Lyons* v. *Globe Newspaper Co.*, 415 Mass. 258, 262 (1993), quoting *National Ass'n of Gov't Employees, Inc.* v. *Central Broadcasting Corp.*, 379 Mass. 220, 227-228 (1979). We are guided by the Restatement (Second) of Torts § 566 (1977) in such matters. That section reads:

> "A defamatory communication may consist of a statement in the form of an opinion, but a statement of this nature is actionable only if it implies the allegation of undisclosed defamatory facts as the basis for the opinion."

We have applied a two-step inquiry to this rule. See *Lyons* v. *Globe Newspaper Co.*, *supra* at 263-265. First, we must determine if the balance of the Damish article qualifies as an expression of opinion. If unambiguous, this is a determination of law for the court. *Id.* at 263. "The court must 'examine the statement in its totality in the context in which it was uttered or published. The court must consider all the words used, not merely a particular phrase or sentence. In addition, the court must give weight to cautionary terms used by the person publishing the statement. Finally, the court must consider all of the circumstances surrounding the statement, including the medium by which the statement is disseminated and the audience to which it is published.' " *Id.*, quoting *Fleming* v. *Benzaquin*, 390 Mass. 175, 180-181 (1983).

We conclude that the balance of Damish's article is an expression of opinion. While not on the "op-ed" page of the newspaper,

---

[27]That Howell's hearing also included images, taken from an adult Internet Web site, of women and men that imply that they are having sex further undercuts any claim that the Enterprise reported false facts.

the article is replete with rhetorical flair and hyperbole typical of an opinion piece. See *Aldoupolis* v. *Globe Newspaper Co., supra* at 734-735. Damish called Savino and Howell "dogs" who made "a mockery" of public institutions by bringing their "quirky cravings" into the workplace. He called the images "garbage." As a matter of law, these were statements of opinion.

Thus, "[w]e turn next to the issue whether the expressions of opinion found in the challenged article were based on disclosed nondefamatory facts or whether they implied 'that there are undisclosed facts on which the opinion is based.' " *Lyons* v. *Globe Newspaper Co., supra* at 264, quoting *National Ass'n of Gov't Employees, Inc.* v. *Central Broadcasting Corp., supra* at 227. We have already surveyed the factual premises for the opinion. See *Lyons* v. *Globe Newspaper Co., supra* at 264. We have also already established that the disclosed facts were not defamatory because they were categorically true. Therefore, the Damish article was based on disclosed nondefamatory facts. This is sufficient to require entry of summary judgment for the Enterprise. See *id.* at 266.

c. *Infliction of emotional distress.* Howell also claims the authors of the articles, Allan Stein and Elaine Allegrini, are liable to him for intentional infliction of emotional distress. To prevail, Howell must show "(1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct . . . ; (2) that the conduct was 'extreme and outrageous,' was 'beyond all possible bounds of decency' and was 'utterly intolerable in a civilized community' . . . ; (3) that the actions of the defendant were the cause of the plaintiff's distress . . . ; and (4) that the emotional distress sustained by the plaintiff was 'severe' " (citations omitted). *Agis* v. *Howard Johnson Co.,* 371 Mass. 140, 144-145 (1976), quoting Restatement (Second) of Torts § 46 comments d & j (1965). Howell must also show that the reporters acted "without privilege." *Agis* v. *Howard Johnson Co., supra* at 142, quoting *George* v. *Jordan Marsh Co.,* 359 Mass. 244, 255 (1971).

Howell rests his claim on the same articles as his defamation claim. We have held that with the exception of a single sentence in one report, all of the reports were privileged, and therefore Howell's claim must fail as a matter of law. See *Yohe* v. *Nu-*

*gent*, 321 F.3d 35, 44-45 (1st Cir. 2003). This is compelled by the nature of the privilege: "a plaintiff cannot evade the protections of the fair report privilege merely by re-labeling his claim." *Id.* at 44, citing *Correllas* v. *Viveiros*, 410 Mass. 314, 324 (1991). As for the sliver of Stein's and Allegrini's reporting that we held outside the privilege, Howell's claim also fails. The erroneous statement about whether a conflict of interest charge against Howell had been sustained by no stretch of the facts constitutes "extreme and outrageous" conduct sufficient to support a claim of intentional infliction of emotional distress. Summary judgment should have been entered for the defendants.

3. *Conclusion.* The order denying the Enterprise's motion for summary judgment on the defamation and intentional infliction of emotional distress claims is reversed. Summary judgment is to enter for the Enterprise.

*So ordered.*

SPINA, J. (concurring in part and dissenting in part). I concur with the court's decision in all respects except its application of the fair report privilege to the August 3, 2005, article that provided details of the August 2 executive session of the sewer commission. I would not apply the privilege to that article.

In its analysis the court relies on the Restatement (Second) of Torts § 611 (1977). *Ante* at 652. Comment a to § 611 states, "It is not clear whether the privilege extends to a report of an official proceeding that is not public or available to the public under the law."

The court also cites two policies underlying the fair report privilege as applicable to this case. The first, known as "the agency rationale, protects the press when it reports on official actions and statements that members of the public *could have witnessed for themselves*" (emphasis added). *Ante* at 652-653. Writing for this court, Justice Holmes said the "[fair report] privilege and the access of the public to the courts stand in reason upon common ground." *Cowley* v. *Pulsifer*, 137 Mass. 392, 394 (1884). This policy is not limited to courts but extends generally to all public bodies. See *Barrows* v. *Bell*, 7 Gray 301, 313 (1856).

The significance of this policy is that if the public could not attend the meeting of the sewer commission concerning Howell, then The Enterprise Publishing Company, LLC, and its reporters (collectively, the Enterprise) could not rely on the fair report privilege to report the conduct of the meeting to the public. Here, because the hearing was held in executive session, the public could not have witnessed the proceeding, and the first policy could not support application of the privilege to the August 3 article.

The second policy on which the court relies is the role of "public supervision" attributed to the news media. That is, the privilege "is generally seen as allowing the news media to serve as a check on the power of government by giving the public the opportunity to be informed citizens and voters." *Ante* at 653. Significantly, the Enterprise points to nothing improper in the conduct of the executive session conducted by the sewer commission, especially the vote to enter executive session or the maintenance of the records of the executive session in secret. See G. L. c. 39, § 23B, fourth par. (executive session may be convened to consider discipline of public employee). It may be presumed that, had the Enterprise thought that the proceeding was conducted improperly, it would have filed a civil action under G. L. c. 39, § 23B, seventh, eleventh, and thirteenth pars., challenging the vote to enter executive session and the secret maintenance of the records of that session. That would have been the legislatively established method for the Enterprise to fulfil its public supervision role. The Enterprise did not pursue this course.

The policy behind permitting a governmental body to consider the discipline of a public employee in executive session and to extend the secrecy of those proceedings until the process is concluded, or for other valid reasons, is good government. G. L. c. 39, § 23B, fourth and seventh pars. That is not questioned. Disclosure of the details of those proceedings by an official sworn to uphold that policy violates that policy and is not consonant with good government. A newspaper that publishes such detail before the governmental body releases its records to the public cannot be said to be acting in its public supervision role.

The court places great importance on the fact that what oc-

curred in the August 2, 2005, executive session was an "official action." *Ante* at 654-660. This ignores the fact that under G. L. c. 39, §§ 23A-23C, the so-called open meeting law, the Legislature has authorized municipal agencies to conduct certain business in executive session. The court says, "The privilege to report official actions would mean very little, however, if to qualify for its protection, the media were limited to reporting such actions solely on the basis of on-the-record statements by high-ranking (authorized to speak) officials or published official documents." *Ante* at 658. Generally, I agree, but the cases on which the court relies do not involve executive session. Today's decision renders the legislative enactment as to executive session meaningless, because the policy behind G. L. c. 39, § 23B, fourth and seventh pars., can be eviscerated by the news media acting with anyone who was present at an executive session, including an accuser, someone bearing a grudge against the employee, or a member of the governmental body in question (even one who voted to go into executive session), to publish material that the Legislature determined should be kept temporarily secret. See *Conner* v. *Standard Publ. Co.*, 183 Mass. 474, 479 (1903); *Bufalino* v. *Associated Press*, 692 F.2d 266, 270-272 (2d Cir. 1982), cert. denied, 462 U.S. 1111 (1983) ("Only reports of *official* statements or records made or released by a public agency are protected by the § 611 privilege" [emphasis in original]). This conflict between the common-law fair report privilege and the open meeting law must be resolved in favor of the statute. See *Taygeta Corp.* v. *Varian Assocs., Inc.*, 436 Mass. 217, 226 (2002); *Southworth* v. *Edmands*, 152 Mass. 203, 211 (1890) (Knowlton, J., dissenting).

None of the policies behind the fair report privilege supports its application to the August 3, 2005, article. I respectfully dissent from that aspect of the court's decision.